**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SUPERIOR FIREPROOF DOOR & SASH COMPANY, Inc., Respondent.**

No. 163, Docket 26430.

United States Court of Appeals Second Circuit.

Argued Jan. 19, 1961.

Decided March 28, 1961.

Rehearing Denied April 19, 1961.

Warren M. Davison, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles and Warren M. Davison, Attys., Washington, D. C., on the brief), for petitioner.

Sidney O. Raphael, New York City of Raphael, Searles, Levin & Vischi, New York City (Leo M. Drachsler of Raphael, Searles, Levin & Vischi, New York City, on the brief), for respondent.

Before MEDINA, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge.

By petition filed August 8, 1960, the National Labor Relations Board seeks enforcement of an order, 127 N. L. R. B. No. 3, relating to an alleged refusal by respondent-employer to bargain in the summer of 1957. This statement alone highlights one of the problems in this case. There are many others.

#### The Facts

Respondent manufactures and sells hollow doors and allied products. It is a member of Hollow Metal Door and Buck Association. It has offices, each employing a relatively small number of draftsmen and related technical employees, in New York City, Scranton, and Chicago.

On July 5, 1956, Architectural and Engineering Guild, Local 66, American Federation of Technical Engineers, AFL-CIO, was separately certified as bargaining representative for these employees in respondent's New York plant and in the plants of five other Association members;[1] it had previously been so certified as to two more. Local 66 submitted identical contract proposals to the employers. Meetings to discuss these were held in the fall of 1956, one in August, four in October, and one on November 1. At the November 1 meeting, the Association presented a counter-proposal; Local 66's Business Manager, Raimist, announced that he was invoking the separate certifications and that, although the Local would continue to meet with more than one company at a time, all further bargaining would be deemed to be on an individual basis. The New York Mediation Board came into the matter and held a meeting on December 5; the mediator announced he would call the next meeting.

Before he did, two developments occurred. On January 7, 1957, Local 66 was certified as bargaining representative for respondent's Scranton unit; it submitted the same proposals theretofore made for New York. In March, 1957, Local 66 entered into an agreement, effective January 1, 1956, with Aetna Steel Products Corp., a member of the Association and the largest company in the industry; this agreement contained a clause, characterized as a "most favored nation clause" but, at least in language, going beyond the usual meaning of that term, whereby Local 66 agreed that "no other Employer in The Hollow Metal Door & Buck Industry shall be accorded terms and conditions in a collective bargaining agreement which are more favorable than those contained herein; including classifications and minimum rates of pay. The foregoing however, shall not apply to general wage increases and rates of pay."

---

1. Petitions for enforcement of orders relating to other members are pending before other panels of this Court, N. L. R. B. v. Katz, Docket No. 26289; N. L. R. B. v. Firedoor Corp., Docket No. 26483.

The New York mediator convened the next meeting for March 29, 1957; this was attended by a number of Association members. Local 66 proposed the Aetna contract. Further multi-employer meetings were held on April 4, April 11, May 1 and May 13, the employers submitting a complete counter-proposal about May 8 and these negotiations breaking down on May 13.

Bargaining between Local 66 and respondent individually then began. Eight meetings were held between May 20 and June 14. Raimist and two New York committeemen, Kay and Feiner, represented the union; respondent's president, Schaffer, and, occasionally, Oxman, assistant superintendent at Scranton, Raphael, respondent's counsel, and Popik, its secretary, acted for the company. Early in the negotiations—Schaffer saying May 20 and Raimist May 27, a date which we shall accept—the company presented an eight-page typewritten document entitled "Additions to Be Added or Incorporated into the Proposed Agreement." The subsequent meetings involved bargaining as between the union position, embodied in the Aetna contract, and the company's counter-proposal, as developed. At the June 14 meeting the employer and the union were still far apart on a number of items. The record is confused with respect to a meeting expected to be held on June 15, with Raimist and respondent each alleging the other was at fault for not attending and the Board making no findings as to who was to blame. On the morning of Monday, June 17, Schaffer wrote Raimist, complaining of the failure to hold the Saturday meeting and pressing for a speedy solution because of warnings by several employees that otherwise they would leave respondent's employ to obtain higher wages; Schaffer said that unless an early agreement was reached, respondent would be obliged to take wage action to prevent the loss of these skilled workers and proposed another meeting on June 21, the first day when he would be available.

At noon on June 17, the New York employees walked out without notice. Schaffer thereupon addressed a second and somewhat heated letter to Raimist. He said that the walkout did not indicate "that you have acted or are attempting to act in good faith"; that, on the other hand, "if this walkout was not the instructions of your local, it could only mean to me that you do not have control of these men and do not properly represent them"; that respondent was "going to proceed to hire any of these employees who approach us and new employees"; and that "this shall necessarily completely change our position in bargaining with you, and we must necessarily question your right to bargain for these or any employees within this bargaining unit." Copies of this letter were sent to the National Labor Relations Board and the New York Mediation Board, as well as to the American Federation of Technical Engineers. The New York Board intervened, and meetings were held under its auspices. Raimist, Kay, Feiner and Raphael attended, and Schaffer was in another room; no question as to the authority of Local 66 to represent the employees was raised. There is evidence that the employees became disillusioned about Local 66 when one of the mediators told them Schaffer was justified in locking them out. On June 21 the employees were notified to return to work June 24. Grasso, a senior draftsman called as a witness by General Counsel, arranged to see Schaffer on June 22 and inquired whether Schaffer "felt bitter toward us and would he take it out on us, and fire us if we left the Union. Schaffer answered that he had no ill feelings toward us or toward the Union * * * that he did not care if we stayed in the Union or if we got out of the Union." Raimist testified that a meeting had been arranged for June 25; his testimony that his secretary told him Raphael's secretary had cancelled this because Schaffer had to go to Scranton was stricken as hearsay. Raimist then asked the Media-

tion Board to request a meeting; they advised him to be patient.[2]

Respondent's plants were closed for vacation during the week of July 1. During this period, on July 5, the anniversary of Local 66's certification occurred. Six days thereafter, July 11, 1957, Grasso, at the request of the New York employees, invited Schaffer and chief draftsman Boegner to attend a dinner meeting after working hours. Grasso, Capobianco, another senior draftsman called by General Counsel, and Schaffer testified as to what there occurred; their testimony was in accord. Eight of the eleven men in the unit attended. Grasso began by telling Schaffer "that we were resigning from the union, whether anything was settled or not we definitely made up our minds to resign from Local 66." Schaffer responded "it was up to us, he didn't care what we did, whether we resigned from the union or didn't resign from the union. He made proposals to Local 66 and the same proposals would remain whether we got out or stood in the union." Schaffer outlined proposed salary increases; the men asked when these would become effective. Schaffer said "he couldn't very well negotiate with us being that Local 66 was our bargaining unit." The men repeated they were resigning from Local 66 and asked whether the raises could be put into effect if they did; Schaffer answered affirmatively. The men told Schaffer they would like to form their own guild after decertification of the union; they asked whether he would sign an agreement with such a guild, embodying what he had offered; he said he would and offered the services of the company's counsel if the men decided that was what they wanted. Grasso then polled the meeting; all present indicated their desire to resign from Local 66. Some employees wrote out their resignations at once; others, including Feiner, signed letters the following day. During the week of

the walk-out Grasso had gone to the Board's New York office and obtained a form of decertification petition; an attempt was made to fill this out. During the week ending July 13, respondent gave wage increases to New York employees as outlined at the meeting. On July 15, Raimist telephoned Schaffer; he said the latter told him "that we no longer represent the employees and he wasn't going to bargain any more." A charge was filed the following day.

During all this time very little attention had been paid to Scranton. When the Scranton employees returned to work in early July after their vacation, they approached Kielmeyer, the superintendent of the Scranton plant, about additional vacation time. He urged them to join Local 2350, United Brotherhood of Carpenters and Joiners of America, AFL-CIO, which represented the Scranton production employees, mentioning that the technical employees had received no benefits through Local 66. McGrath, president of Local 2350, had made efforts along these same lines during the spring. Shortly after the meeting on July 11 in New York, Kielmeyer called two of the Scranton employees, Ratzell, a committeeman of Local 66, and Onofrey, to the telephone to accept a call from Grasso in respondent's New York office. Grasso informed them of the resignation of the New York employees from Local 66 and of the increases that had been offered; he suggested the Scranton employees should talk directly to Schaffer. Ratzell asked to speak to Kay, who confirmed the resignation and said he was "dumbfounded." In the next few days Local 2350 made efforts, which respondent may have assisted to some degree, to organize the Scranton technical employees; these came to an end when Local 2350's business agent advised that an election was impossible in view of the charge filed by Local 66. For the week ending July 13, respondent gave wage increases to

---

**2.** Schaffer testified that at some time after June 25 but before July 11 he received a call from a Mr. Stephens, who represented himself as President of the International to which Local 66 belonged; Schaffer expressed willingness to meet with Stephens but heard nothing more from him.

11 Scranton technical employees. About July 20, several Scranton employees who had been adherents of Local 66 signed a letter that they were resigning because the company had now placed them in a position where they were a minority and company men a majority. Ratzell and others saw Schaffer when the latter came to Scranton. Schaffer protested the form of the letter. Ratzell destroyed it; subsequently he obtained a simple letter of resignation signed by seven of the fourteen employees in the unit. Ten employees received wage increases during August.

Upon this and other evidence, Trial Examiner Winkler found that respondent had violated §§ 8(a) (1) and (5), 29 U.S. C.A. § 158(a) (1, 5) with respect to both New York and Scranton. The Board, without discussion, adopted the Examiner's findings, conclusions and recommendations, and ordered respondent to bargain with Local 66 and to cease and desist from various specific acts deemed to violate the Act.

### The Effect of the Aetna Contract

■ At the outset we must consider a contention which respondent claims to be sufficient in itself to condemn the Board's order—namely, that Local 66's agreement not to accord more favorable terms and conditions to any other employer than to Aetna prevented the union from bargaining in good faith and thereby absolved respondent from any duty toward the union. Whether or not respondent would have been wholly relieved if Local 66 had stood adamantly on the Aetna contract, at least, as the Board has properly recognized, Utah County Tractor Sales, 103 N.L.R.B. 1711, 1728 (1953), respondent's duty to bargain would have been rather readily discharged, since, presumably, the parties would have rapidly come to an impasse, with the consequences recognized to flow therefrom, N. L. R. B. v. Sands Manufacturing Co., 1939, 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; N. L. R. B. v. Penokee Veneer Co., 7 Cir., 1948, 168 F.2d 868, 4 A.L.R.2d 1350. Here, however, the factual premise for such a conclusion is wanting. The evidence shows that Local 66 entertained proposals of respondent calling for arrangements different from those with Aetna. In addition, Raimist testified that Raphael had gotten a waiver from Aetna permitting the union to enter into a contract with another employer, Pioneer; that the union had signed contracts with three other employers containing some terms more favorable to the employer than the Aetna contract; and, indeed, that Raphael had told him "not to worry" about Aetna—although Raphael denied the last statement. Nevertheless it does not follow from our rejection of this contention that the impact of the Aetna contract should be wholly disregarded. A union that has thus limited its freedom at the bargaining table can hardly expect that this will not have an effect upon the conduct of the employer; and the course of the negotiations here must be viewed in that light.

### The New York Employees

Although the Examiner professed to be "mindful of the respective certification dates for the New York and Scranton units," he was not sufficiently so. Hence we shall first discuss the unfair labor practices found in respect of the New York employees, as to whom Local 66's certification year expired July 4, 1957, and then turn to Scranton where the certification ran six months longer.

Analysis must necessarily begin with Brooks v. N. L. R. B., 1954, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125. Writing for a unanimous Court, Mr. Justice Frankfurter there traced the history of the Board's rule that a certification must normally be honored for a year, both before and after the Taft-Hartley amendment, 61 Stat. 144, 29 U.S.C.A. § 159(c) (3), forbidding direction of an election within twelve months of another valid election, and upheld a finding that an employer had committed an unfair labor practice when, within the year, he had refused to bargain with a union which he reasonably believed to have ceased to represent a majority. However, the

Court also noted, 348 U.S. at page 104, 75 S.Ct. at page 181, that "the Board has ruled that one year after certification the employer can ask for an election or, if he has fair doubts about the union's continuing majority, he may refuse to bargain further with it," citing for the second proposition Celanese Corp. of America, 95 N.L.R.B. 664, and said: "This, too, is a matter appropriately determined by the Board's administrative authority."

■ Subsequently, the Board has gone beyond the Celanese case and has held that after the lapse of a year the employer may not only refuse to bargain with a certified union which he has reasonable grounds to believe has lost majority support, but may also change wages or conditions of employment, although he does the latter at his peril that his belief as to the loss of majority is not only reasonable but right, Stoner Rubber Co., 123 N.L.R.B. 1440 (1959); see also National Carbon Division, 105 N.L.R.B. 441 (1953); American Laundry Machine Co., 107 N.L.R.B. 1574, 1583 (1954). The Stoner decision was a divided one, with Chairman Leedom joining to make a majority although believing that good faith belief as to loss of majority was sufficient, and with two members dissenting. Whether the views of Chairman Leedom or those of his majority colleagues are the right ones, we agree with the decision that an employer does not violate the Act by acting in the circumstances stated—as the Fifth Circuit also has recently held, N. L. R. B. v. Minute Maid Corp., 1960, 283 F.2d 705, 710–711. Such a view accords not only with the Supreme Court's statement in Brooks but with the exigencies of business life. Decertification is a time-consuming endeav-

or; indeed, as we understand it, a petition to decertify Local 66 here would not yet have been processed.[3] If an employer wishes full protection from claims of a union, he may find it "better practice" to await decertification as the Board suggested in cases cited in the Brooks opinion, 348 U.S. 104, footnote 18, 75 S.Ct. 182, 99 L.Ed. 125; but if he is willing to have less protection, perhaps in order to have more employees, he may lawfully make that choice under the circumstances defined in Stoner and Minute Maid.

■ However, a condition to any right of the employer to refuse, after the certification year, to bargain with a union which he reasonably thinks has lost its majority, or to bargain with another group which he thinks to be the majority, or to act unilaterally, is that "the loss of majority was not attributable to unfair labor practices of the employer," N. L. R. B. v. Minute Maid Corp., supra, 283 F.2d at page 710; N. L. R. B. v. Henry Heide, Inc., 2 Cir., 1955, 219 F.2d 46, certiorari denied 1955, 349 U.S. 952, 75 S.Ct. 881, 99 L.Ed. 1277; Stoner Rubber Co., supra, at 1443. The Examiner refused to apply the Stoner rule on the ground that this condition did not exist here.

■ This is the crucial issue. The Examiner found, and the Board affirmed, "that respondent failed to bargain in good faith with Local 66 from the outset of negotiations * * *" Under the most liberal view of the Board's power to find facts and draw inferences, Radio Officers' Union, etc. v. N. L. R. B., 1954, 347 U.S. 17, 50, 74 S.Ct. 323, 340, 98 L. Ed. 455, this conclusion is unsupported. However, we do not take the first Chenery case [Securities and Exchange Commission v. Chenery Corp.], 1943, 318 U.S.

3. In normal certification cases other than consent elections the average total time consumed from petition to certification is 110 days—28 till notice of hearing, 85 till decision whether or not to hold an election, and 110 till certification. Organization and Procedure of the National Labor Relations Board: Report to the Senate Committee on Labor and Public Welfare, S.Doc. No. 81, 86th Cong., 2d

Sess. (1960), pp. 1, 7, 8. In a case like the present the time required for decertification is likely to be much longer due to the Board's practice of not entertaining a decertification petition while a charge of unfair labor practice is pending, see N. L. R. B. v. Minute Maid Corp., supra, 283 F.2d at pages 708, 711; Cox, Cases on Labor Law (4th ed. 1958), 341–42.

80, 63 S.Ct. 454, 87 L.Ed. 626, to go so far as to hold that this error invalidates the order if "substantial evidence on the record considered as a whole" would have justified the more modest and legally sufficient conclusion, embraced within the larger one, that respondent failed to bargain in good faith at some time during the certification year—although, on the other hand, a reviewing court can scarcely erase suspicions as to objectivity necessarily arising from so gross an overstatement. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 489–491, 71 S.Ct. 456, 95 L.Ed. 456. Here the incidents claimed to justify even the more limited conclusion fail to do so, even with the obligation to respect the Board's powers to find facts and to draw inferences within the range of reason which we have just reaffirmed in N. L. R. B. v. Marcus Trucking Co., 1961, 286 F.2d 583.

■ The Board's brief advances a number of such incidents. It says that "during the pendency of negotiations respondent unilaterally granted six wage increases to employees in the unit." A more accurate statement, less likely to cause misunderstanding, would be that respondent granted one increase of $5 per week to five employees in the units, two in New York and three in Scranton, and a second $5 increase to one of the former. Amplification would add that most of these employees were low on the salary list, that each increase was at a different date, that five of the six increases were at dates when no active bargaining was in progress, that the increases were no more than the company had offered the union, and that there is nothing in the long record to indicate the slightest protest by the union over any of them. These isolated wage adjustments, granted to different employees at different times, apparently in an effort to bring them up to their proper place in the scale, bear no resemblance to the "general increase in the rates of pay applicable to most of the employees who had been represented in the negotiations," condemned in N. L. R. B. v. Crompton-Highland Mills, Inc., 1949, 337 U.S. 217, 69 S.Ct.

960, 93 L.Ed. 1320. See N. L. R. B. v. Bradley Washfountain Co., 7 Cir., 1951, 192 F.2d 144, 147–148; Cone Brothers Contracting Co. v. N. L. R. B., 5 Cir., 1956, 235 F.2d 37, 41–42, certiorari denied 1956, 352 U.S. 916, 77 S.Ct. 214, 1 L.Ed.2d 122; N. L. R. B. v. United Brass Works, Inc., 4 Cir., 1961, 287 F.2d 689; cf. N. L. R. B. v. National Shoes, Inc., 2 Cir., 1953, 208 F.2d 688, 692.

■ A second item is that Schaffer distributed a copy of the company's May 27 proposals to the New York employees, without notice to the union as the Examiner found. Schaffer claimed this was necessary to prevent the men from quitting for lack of normal increases, and there was no evidence that Schaffer did anything more than inform them what the company was offering. Again the Examiner finds anti-union motivation where the union did not. Raimist testified that when he complained, Schaffer responded "Well, if we made a mistake, let us forget it. Let us get down to business to see if we can straighten things out," and the bargaining resumed. This action was neither a *per se* violation nor even a basis for inference of refusal to bargain. N. L. R. B. v. Norfolk Shipbuilding & Drydock Corp., 4 Cir., 1952, 195 F.2d 632, 637.

■ The third item relied on is that respondent insisted that the union give "withdrawal cards" to members who had become supervisors or salesmen and thereby had ceased to belong to the bargaining unit, and that the shop steward should be elected by the employees only from among the senior men, thereby committing an unfair labor practice within N. L. R. B. v. Wooster Division of Borg-Warner Corp., 1958, 356 U.S. 342, 78 S. Ct. 718, 2 L.Ed.2d 823. Assuming, as we do, that "withdrawal cards" mean cards evidencing withdrawal from the union and not simply from the bargaining unit, the former request was one on which respondent could not lawfully break off bargaining. Perhaps the second was likewise so, cf. Prudential Ins. Co. of America v. N. L. R. B., 3 Cir., 1960, 278 F.2d 181, although the contrary

seems arguable. However, as Borg-Warner itself stated, 356 U.S. at page 349, 78 S.Ct. at page 723, it is not an unfair labor practice for an employer to propose clauses outside the area of compulsory bargaining; what is unlawful is for him to "insist upon them as a condition to any agreement." The record does not warrant a conclusion that respondent did that; these were among the many items yet unresolved when the walk-out of June 17 ended the bargaining.

■■■■ We thus find no basis for a conclusion that respondent's conduct up to June 17 evidenced, in Judge Magruder's phrase, "a desire not to reach an agreement with the union," N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir., 1953, 205 F.2d 131, 134, certiorari denied 1953, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391.[4] True the negotiations had been lengthy, but this was due in considerable part to their three-phase character and to the complications introduced by the union's signing the Aetna contract, see Utah County Tractor Sales, supra. Nothing suggests that respondent was attempting to stall beyond the New York certification year; the later expiry of the Scranton certification deprived the company of any motivation to do that, and the evidence shows respondent was pressing for a conclusion because of the effects the lack of wage increases was having on employee morale. It is of no moment that the result the company desired differed from that demanded by the union, 29 U.S.C.A. § 158(d); N. L. R. B. v. United Clay Mines Corp., 6 Cir., 1955, 219 F.2d 120, 125–126.

We see no basis for a different conclusion, as regards the New York employees, in anything that happened on June 17 or thereafter. The letter of that morning was surely innocent; the letter of the afternoon was a natural response to the walk-out and its threat did not go beyond permissible limits. Moreover, the threat was not carried out. Respondent continued to meet with Local 66 representatives while the strike was in progress, although, to be sure, the meetings dealt with the immediate problem of getting the men back to work rather than with the ultimate one. Neither was there any refusal to bargain in the short interval between June 24, when the men went back to work, and July 4, when the certification year ended. There was no evidence of a clear union demand for a meeting and an unwarranted refusal, N. L. R. B. v. Columbian Enameling & Stamping Co., 1939, 306 U.S. 292, 297–298, 59 S.Ct. 501, 83 L.Ed. 660; the plant was on vacation for half the period; and everything suggests the Local regarded the period as a needed cooling-off.

We likewise find no basis for finding an unfair labor practice as to the New York employees in what transpired at the meeting held on July 11, or thereafter. The Examiner persistently ignored the entirely different considerations applicable now that the year had run. The evidence is uncontradicted that the meeting was organized by the employees without any stimulation by respondent, and, indeed, that the movement for resignation had been initiated, again without stimulation by respondent, some twenty days earlier. The Board complains that Schaffer gave the men more at the meeting than he had offered the union. That would not be an unfair labor practice in itself, although giving a wage increase greater than offered during the year might be evidence of a lack of good faith in the previous bargaining. Whether such an inference might be reasonably drawn would depend on various factors, particularly the length of time between the last bargaining session and the new offer and the extent by which the new offer exceeded the old. Here the interval was relatively short but the excess seems to have been very small, if, indeed, there was any. The Board claims three employees received higher wage rates as

4. A leading commentator considers this the most precise articulation of the meaning of § 8(a) (5) and one which is ■■■■■■■ gaining acceptance. Cox, The Duty to Bargain in Good Faith, 71 Harv.L.Rev. 1401, 1417, fn. 57 (1958).

of July 8, 1957, than Schaffer offered the union on June 3 for application June 1; but all these were raises to the $110 level for senior draftsmen which respondent proposed on May 27. It may be that some of the wages offered on July 11, 1957 for application July 1, 1958, were $5 a week higher than those offered on June 3 as upped on June 6, whereas some others may have been lower; but the evidence is far from clear, and in any event the differences are too small to provide the basis for an inference of previous bad faith. The Board claims the July 11 offer was superior in two other respects, namely, that Schaffer indicated he would continue to pay Christmas bonuses which he had declined to make a part of the union contract, and that he proposed super-seniority for the New York employees for purposes of lay-offs whereas he had previously insisted that lay-offs be made equally among the three offices. As to the former, Schaffer's position had been that if he was to be forced into a contract largely following that with Aetna, which he disliked, he was not going to commit the company to what he considered an act of grace; his remark at the July 11 meeting, and his subsequent performance, were quite consistent with this and afford no indication of bad faith. Similarly, when we examine the record to see precisely what was said with respect to lay-offs, both before and at the July 11 meeting, we again find the characterization substantially outruns the fact.

It follows that when Schaffer declined to bargain further for the New York employees as Raimist requested on July 15, he committed no unfair labor practice; and the Board's findings and conclusions as to the New York employees are not supported by the record taken as a whole.

### The Scranton Employees

The legal situation relating to the Scranton employees differs in an essential respect. Whereas, after July 4, 1957, respondent was under no duty to bargain with Local 66 for the New York employees if it had reasonable grounds to believe the Local no longer represented a majority, it was bound so to bargain with respect to the Scranton employees until January 7, 1958.

We assume, however, that an employer ought not be cast under § 8(a) (5) for refusal to bargain where, after bargaining has begun, the union has abandoned the employees prior to any action of the employer constituting an unfair labor practice, see Wood Manufacturing Co., 95 N. L. R. B. 633, 644 (1951). Here there was a good deal of evidence, not mentioned by the Examiner, to show neglect or even abandonment of the Scranton employees by the union. Raimist had made it clear prior to certification, and repeated in March after signing the Aetna contract, "that we could not have them [the Scranton employees] upset the pattern of negotiations in the New York area, but rather that the New York area would be setting a general pattern which could be followed when necessary with modifications to suit the area in Scranton." Apparently the Scranton employees received no further information as to the progress of negotiations until a committee met with Raimist at Honesdale, Pennsylvania, on June 17—the day of the walk-out in New York, of which, Raimist testified, he was not aware at the time;[5] Raimist then told the committee "he was going to try to put us in on the

---

5. One of the committee members testified that Raimist had mentioned the walk-out. We must confess to disturbance at the Examiner's acceptance of Raimist, fn. 17, in view of this contradiction and of Grasso's and Capobianco's contradiction of his testimony that the June 17 walk-out took place without his knowledge. If anything turned on Raimist's testimony in instances where it was contradicted, we might well find this to be one of the rare cases where a reviewing court is compelled to upset even an agency's approval of an Examiner's finding of credibility, see N. L. R. B. v. Marcus Trucking Co., supra; 4 Davis, Administrative Law Treatise (1958), § 29.06.

tail end of those [New York] bargainings." Before the Scranton employees resigned from Local 66, they telephoned Raimist and asked him to come promptly to Scranton, which he declined to do at the time sought—a refusal that strengthened their purpose to resign.

■ Nevertheless we think the Board was warranted in finding a refusal to bargain in violation of § 8(a) (5) in respect of the Scranton employees in respondent's negative answer to Raimist's telephone request of July 15. This evidenced a desire by the union to bargain, and although respondent was justified in declining the invitation as to New York, it was not as to Scranton. Of course, it is questionable whether Raimist would have accepted an offer by respondent to negotiate only for Scranton, but the Board could deem respondent bound to make it. Similarly it is immaterial that Local 66 made no further attempt to negotiate for the Scranton employees; none was required in the light of the evidence that this would have been futile, N. L. R. B. v. Burton-Dixie Corp., 10 Cir., 1954, 210 F.2d 199, 201. Furthermore the Board was justified in finding violations of both § 8(a) (5) and § 8(a) (1) on the basis of conclusions permissibly drawn from Kielmeyer's efforts early in the week of July 8 to persuade the Scranton employees to join another union and the telephone call from Grasso to Ratzell, inferably stimulated by respondent, both of which antedated abandonment of the Scranton employees by Local 66. Also the wage increases granted all the Scranton employees during the certification year stand on a different basis from those given the New York employees after the certification year there had expired. The July increases were sufficiently general to have been a basis for finding a refusal to bargain in violation of § 8(a) (5) under Crompton-Highland Mills, since they antedated the July 15 telephone call and the union's disappearance; and both would permit a finding of consequent violation of § 8(a) (1), Medo Photo Supply Corp. v. N. L. R. B., 1944, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007.

### The Remedy

■ The final question is whether, as to Scranton, we should enforce the Board's order as drawn or make enforcement conditional upon the Board's ascertaining by a new election whether Local 66 would now be the employees' choice, as was done in N. L. R. B. v. Adhesive Products Corp., 2 Cir., 1960, 281 F.2d 89 and N. L. R. B. v. Marcus Trucking Co., 2 Cir., 1961, 286 F.2d 583. We shall follow the latter course, particularly because of the inordinate delay that characterized the course of this proceeding before the Board.

The average time lapse between the filing of a charge and final decision of the Board is 475 days, see Organization and Procedure of the National Labor Relations Board, Report to the Senate Committee on Labor and Public Welfare, S. Doc. No. 81, 86th Cong., 2d Sess. (1960), pp. 1–2.[6] Here the time lapse was 1015 days, 471 of these intervening between the filing of the charge and the issuance of the complaint. We suggested at the argument that the Board might wish to proffer some explanation of this in its reply brief; it chose not to do so but rather to argue that the delay, while "unfortunate," is not prejudicial since no back pay is involved. That, however, is not the only possible element of prejudice in an order that would forbid an employer's making changes in wages and other terms and conditions of employment during the indefinite term set for

6. "The one and a half years it takes the National Labor Relations Board to reach decision in an unfair labor practice case is said by one with long experience in that field to mean that, apart from the cases being conducted under the shelter of a preliminary injunction, the ultimate decision almost never makes any practical difference to the labor relations between the parties." Warner W. Gardner, The Administrative Process, in Legal Institutions Today and Tomorrow (M. G. Paulsen, ed. 1959), pp. 119–20.

further bargaining with a union. Local 66 had not given truly effective representation to the Scranton employees in the six months after it was certified, it has not represented them for nearly four years, and it may well not be their choice to represent them now; we propose only that the Board ascertain whether it is. See N. L. R. B. v. Seven-Up Bottling Co., 1953, 344 U.S. 344, 349, 73 S.Ct. 287, 97 L.Ed. 377. We are fully cognizant of the arguments why in many cases a certified union ousted by unfair labor practices of an employer should not be subjected to an election, but these have more force in cases of illegal assistance to a rival union or of the violent anti-union practices of earlier years than to anything shown here; and their force also must diminish with the passage of time. Nor may we forget that the interests to be protected are primarily those of the employees, importantly including, of course, their right to effective union representation, rather than of the union itself. We do not regard N. L. R. B. v. Mexia Textile Mills, Inc., 1950, 339 U.S. 563, 70 S.Ct. 833, 94 L.Ed. 1067, and N. L. R. B. v. Pool Manufacturing Co., 1950, 339 U.S. 577, 70 S.Ct. 830, 94 L.Ed. 1077, relating to the effect of delay in petitioning for enforcement of orders which the parties could have had reviewed, as forbidding the imposition of the condition here proposed.

We therefore deny enforcement of the order as to the New York employees, and grant it as to the Scranton employees conditionally upon the Board's holding an election, within 60 days after our order becomes final, to determine whether the Scranton bargaining unit desires to be represented by Local 66.

On Petition for a Rehearing.

PER CURIAM.

The National Labor Relations Board petitions for rehearing of so much of our decision as conditioned enforcement of the portion of its order requiring respondent to bargain with Local 66 as to the Scranton employees on the holding of an election. The petition is denied.

The Board claims the imposition of this condition violated the provision, in § 10(e) of the Act, 29 U.S.C.A. § 160 (e), that "no objection that has not been urged before the Board * * * shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances," since, as it contends, respondent's request for such a condition was first made in its brief in this Court. We find it unnecessary to consider whether respondent's consistent objection before the Board to any order requiring it to bargain with Local 66 did not fairly raise the lesser question whether any direction to bargain should not at least be conditional on ascertaining whether the employees still desired this, see N. L. R. B. v. Revere Metal Art Co., 2 Cir., 1960, 280 F.2d 96, 105, certiorari denied 1960, 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed. 2d 189, or whether the rendition of our decision in N. L. R. B. v. Adhesive Products Corp., 2 Cir., 1960, 281 F.2d 89 subsequent to the Board's order did not constitute an "extraordinary circumstance" within § 10(e), as we held with respect to a supervening decision of the Supreme Court in N. L. R. B. v. Lundy Manufacturing Corp., 2 Cir., 1960, 286 F.2d 424. For the Board is precluded by its own conduct from advancing this contention on petition for rehearing. The Board's reply brief dealt on the merits with respondent's request for a condition, seeking to distinguish the Adhesive Products decision on the same grounds urged in the petition for rehearing. Having thus argued the merits, the Board may not now seek rehearing on the ground that the issue was not properly before us. W. E. Hedger Transp. Corp. v. Ira S. Bushey & Sons, Inc., 2 Cir., 1946, 155 F.2d 321, 325, certiorari denied 1946, 329 U.S. 735, 67 S.Ct. 100, 91 L.Ed. 635; General Accident, Fire & Life Assurance Corp. v. Smith & Oby Co., 6 Cir., 1960, 274 F.2d 819.

The Board again seeks to distinguish the Adhesive Products case and also N. L. R. B. v. Marcus Trucking Co., 2 Cir., 1961, 286 F.2d 583, cited in our opinion,

on the basis that in neither case had the union been certified. The distinction, verbally correct, lacks legal significance—indeed, the Marcus case could well be regarded as an *a fortiori* one since, on the Board's findings which we accepted, the union there, although not certified, had a collective bargaining contract. N. L. R. B. v. P. Lorillard Co., 1942, 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380, now relied upon by the Board although not cited to us in its reply brief, is distinguishable as not involving the inordinate delay in the Board's disposition of the proceeding which was a principal ground for our order here.