**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**STAUB CLEANERS, INC., and Ben Barnet Cleaners, Inc., Respondents.**

**No. 45, Docket 33277.**

United States Court of Appeals Second Circuit.

Argued Sept. 16, 1969.

Decided Nov. 4, 1969.

Concurring Opinion Nov. 12, 1969.

Lumbard, Chief Judge, dissented.

Robert A. Giannasi, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Robert A. Giannasi, Washington, D. C., Madge F. Jefferson, Alexandria, Va., on the brief), for petitioner.

Carl R. Krause, Rochester, N. Y. (Carl R. Krause, Rochester, N. Y., Richard N. Chapman, Harris, Beach & Wilcox, Rochester, N. Y., on the brief), for respondents.

Before LUMBARD, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge.

Most issues on this review turn on whether the NLRB's determination that an election rumor was "neutralized" before the election took place, is supported by substantial evidence. If the rumor was not neutralized, then the Board's finding of unfair labor practices and its subsequent bargaining order must fail.

In 1963, Staub Cleaners, Inc., and Ben Barnet Cleaners, Inc. (the Company) refused to bargain with Local 39, Laundry and Dry Cleaners International Union, AFL–CIO, after the Union won the second of two representation elections. The NLRB subsequently held that the Company had committed unfair labor practices, among them a refusal to bargain (even after the Regional Director had issued a complaint), and a unilateral wage increase. The Board ordered the Company to bargain with the Union. This court, in 1966, reviewed that decision and upheld several unfair labor practice findings against the Company, but remanded to the NLRB for a hearing on whether or not a rumor that the Company would discharge all Negro employees if the Union lost, had invalidated the election. If the election were found invalid, the refusal to bargain charge, and its accompanying bargaining order would be without support. NLRB v. Staub Cleaners, Inc., 357 F.2d 1 (2d Cir. 1966).

As the facts were developed before the Trial Examiner, one Chester Thorpe, a Negro wool presser employed by the Company, told several people that he overheard some Royal Cleaners employees state that there was a rumor that Mr. Barnet, the Company's president, was going to "fire all the colored people" if the Union lost the election. Other employees repeated the rumor, and the Trial Examiner found that it had wide circulation before the election, and had so influenced employees that the election was invalid.

The Board, however, overruled the Trial Examiner, and held that acts and statements after the origination of the rumor effectively neutralized it, and rendered the election valid. Staub Cleaners,

Inc., 171 N.L.R.B. 40 (1968). The events relied upon to support the neutralization theory included at least two direct denials of the truth of the rumor by management personnel in face to face discussions, and a letter from Barnet to all employees on July 22, two days before the election, condemning the "poisonous rumors" among other things. The Union also disassociated itself from the rumor; at a meeting during the election campaign, Frank Iervolino, International Union vice-president, urged the employees to "drop" the matter since there was no proof that Barnet had actually made the statement. At a second meeting, two days before the election, Iervolino again told the employees not to spread the rumor and indicated "we couldn't really prove where it came from or how it originated and I wanted no part of it."

There is no indication that the rumor originated with the Union, and both the Union's subsequent behavior and the facts developed before the Trial Examiner negate any such inference. The Board has been reluctant in the past to give the same weight to anonymous or third party attempts to influence the outcome of certification elections that it gives to improper efforts by the parties themselves. See Benton's Cloak & Suit Co., 97 N.L.R.B. 1327 (1952) (anonymous caller). Cf. Manning, Maxwell & Moore, Inc. v. NLRB, 324 F.2d 857 (5th Cir. 1963). But see NLRB v. Tampa Crown Distributors, Inc., 272 F.2d 470 (5th Cir. 1959) (enforcement of bargaining order denied where no denial by Union of responsibility for anonymous call). Even where the conduct condemned is the product of rank-and-file Union members, the Board has been hesitant to set aside an election in the absence of a showing

that they acted at the command or urging of Union officials. See Orleans Mfg. Co., 120 N.L.R.B. 630 (1958):

"While the Board will consider conduct not attributable to any of the parties in determining whether an election should be set aside, the Board accords less weight to such conduct than to conduct of the parties."

See also E. I. Dupont de Nemours & Co., Inc., 105 N.L.R.B. 710 (1953). The rationale for such a distinction is soundly based. Generally, prejudicial remarks coming from anonymous or non-authoritative sources are apt to be more lightly regarded by employees than those backed up by the employer or the union. Allegations by one who controls the conditions of employment, or who seeks to participate in that control are more likely to carry weight. Moreover, where one of the parties is directly at fault, the most effective deterrent to future misconduct is to deny that party what it sought to gain improperly. But, when unknown third parties are responsible for the improper comments, they have little concern with the expense and annoyance incurred by repeating the election, and the NLRB order in such a case carries with it no deterrent effect.

Since it is not uncommon for elections to be characterized by unfounded rumors, the Board is justified in requiring at the very least that there be a "substantial likelihood" that the outcome was affected by the rumor. See Bok, Regulating NLRA Election Tactics, 78 Harv. L.Rev. 38, 87 (1964). To do otherwise would be to invite endless repetition of certification elections, without any assurance that those which follow would be any fairer than their predecessors.[1]

1. There are, of course, circumstances in which third-party conduct will void an otherwise valid election because neutralization is virtually impossible. P. D. Gwaltney, Jr., & Co., 74 N.L.R.B. 371 (1947), heavily relied upon by the Company, was such a case. The CIO attempted to organize employees of a meat packing company in a small Virginia town. Both weekly newspapers mounted campaigns against the Union, describing it as "Communistic" and gave support to a mass meeting (at which some 400 of the 1300 townspeople were present) during which a Citizen's Committee member warned of the dangers of class and racial strife, and evoked the resurgence of the Ku Klux Klan if the CIO won the election. CIO organizers were escorted out of town by police officials, who made

We must, however, still resolve the conflict between the Board and the Trial Examiner on the neutralization issue. We are instructed to treat Examiner's findings as in effect a part of the record before the Board, and to give them "[no] more weight than in reason and the light of judicial experience they deserve." Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). It should be noted that in *Universal Camera*, difficult credibility questions were involved, but there is little disagreement here over the facts. What we are essentially concerned with is the policy question of the degree to which an election may deviate from ideal "laboratory conditions." It would be difficult to achieve a uniform standard if we treated the Trial Examiner's findings as entitled to more weight than the Board's. This is particularly true where the Board is the agency entrusted with first-line authority to define and apply Congressional policy, and in addition possesses broad experience in conducting and reviewing certification proceedings. It is appropriate in such instances that we give considerable weight to its determinations. See NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) (the NLRB, not the courts, should evaluate deviation from proper election practices).

■■ In the instant case, the combination of Union disavowals, specific management-employee conversations, and the July 22 Barnet letter, represented substantial evidence to support the Board's finding of neutralization.[2] See

National Labor Relations Act, § 10(e), 29 U.S.C. § 160(e) (1964); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 45 (1951). Agreeing as we do that the Board's conclusion that the rumor was neutralized is supported by substantial evidence and the election valid, we are of the view that the Company's unilateral change in wage rates was a violation of its duty to bargain with the Union. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).

■ Staub and the dissent argue that even if an 8(a) (5) refusal to bargain is established, we should refuse to enforce the bargaining order because the NLRB delayed for some 21 months before reversing the Trial Examiner's findings and issuing an order, and waited another year before applying for enforcement. This is not the first time that this contention has been made, and it is not a wholly unattractive one, since it might indeed spur the NLRB to swifter action. However, the Supreme Court in NLRB v. Katz, 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230 (1962), seems clearly to have foreclosed that alternative.[3] If the stark words of *Katz* were not enough the Court in NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), displayed a strong willingness to accept bargaining orders from the Board in circumstances that we would have found inappropriate in the past. See also our decision in NLRB v. Pembeck Oil Corp., 404 F.2d 105 (2 Cir. 1968) vacated, 395 U.S. 828, 89 S.Ct. 2125, 23 L.Ed.2d 737 (1969), on

---

no secret of their hostility towards them. After the union lost, the Board ordered a new election. Merely recounting the circumstances of *Gwaltney* indicates how the rumor in the case at bar pales by comparison.

2. Since two-thirds of the 91 employees were Negro, at least 15 of the 37 who voted against the Union were Negroes, and apparently were not deterred by the rumor, thus lending further support to the Board's finding of neutralization.

3. "The company urges that, because of the lapse of time between the occurrence of

the unfair labor practices and the Board's final decision and order, and because the union was repudiated by the employees subsequently to the events recounted in this opinion, enforcement should be either denied altogether or conditioned on the holding of a new election to determine whether the union is still the employees' choice as a bargaining representative. The argument has no merit. [citations omitted] Inordinate delay in any case is regrettable, but Congress has introduced no time limitation into the Act except that in § 10(b)."

the authority of *Gissel*. In answering the contention that the order would be "harsh" where the union might no longer have a majority, the Court in *Gissel* indicated that it was for the Board, and not the courts, to decide when the order would be appropriate. 395 U.S. at 612 n. 32, 89 S.Ct. 1918. The Court also suggested that if there is any prejudice to the employees in enforcing a bargaining order, that can be avoided by filing a decertification petition. 395 U.S. at 613, 89 S.Ct. 1918.

While we share the dissent's distaste for enforcing stale mandates, we feel duty bound to follow what we believe to be the law so clearly enunciated by the Supreme Court.

The petition for enforcement is granted.

FRIENDLY, Circuit Judge (concurring).

I would join with Chief Judge Lumbard if I felt free to do so, as I did when I wrote NLRB v. Superior Fireproof Door & Sash Co., 289 F.2d 713, 723–724 (2 Cir. 1961) to which he pointedly refers. However, that decision was rendered before the Supreme Court's opinion in NLRB v. Katz, 369 U.S. 736, 748 fn. 16, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). As I stated in my concurring opinion in Bryant Chucking Grinder Co. v. NLRB, 389 F.2d 565, 572–573 (2 Cir. 1967), the footnote in *Katz* "was couched in terms so strong that to impose an exception requires more boldness than I possess" in cases where the employer has refused to recognize a union representing a majority or "to negotiate *in fact*," 369 U.S. at 743, 82 S.Ct. at 1111. Undue delay by the Labor Board in processing such cases creates a painful dilemma between allowing an employer to get away with tactics aimed at destroying the one-time choice of the employees and forcing upon them a union that may not be their present choice. I read *Katz* as saying that the Board's value judgment on that issue is beyond a reviewing court's power to disturb, even in as extreme a case as this. The situation in

NLRB v. General Electric Co., 418 F.2d 736 (2 Cir.), decided October 28, 1969, appeared to me to be different, for reasons outlined in the concluding section of my opinion in that case and unnecessary to repeat here.

LUMBARD, Chief Judge (dissenting).
I dissent.

My colleagues grant enforcement of a Board order which would require Staub to bargain with Local 39 as the representative of its production and maintenance employees although the closely contested election which conferred this status took place more than six years ago, in July of 1963.

The long delay between the expression of employee choice and final enforcement is due almost entirely to the time the Board itself has taken to process this case. Meanwhile, there has been an almost complete turnover of the production and maintenance employees. According to respondent's counsel at oral argument, 90 per cent of the laundry workers who voted in 1963 are no longer employed at Staub's plant—a statement which was not disputed by the Board.

Thus, a proceeding designed to secure speedy recognition for the choice of the employees has—primarily by action of the Board itself—been emasculated to the point where it can be said beyond doubt that there is no basis whatever for supposing that Local 39 is the choice of the employees for whom it is now empowered to act.

The problem of administrative delay has drawn increasing attention from courts and commentators. Professor Davis has stated that "[o]ne of the supposed advantages of the administrative process is speedy disposition of controversies. But the unfortunate fact is that many administrative hearings are slower than comparable judicial proceedings." 1 Davis, Administrative Law Treatise 549–50 (1958); see also, Goldman, Administrative Delay and Judicial Relief, 66 Mich.L.Rev. 1423 (1968); Note, Judicial Acceleration of the Administrative Process; The Right to Relief From Un-

duly Protracted Proceedings, 72 Yale L. J. 574 (1963). Davis also points out that as early as 1955 the President's Conference on Administrative Procedure recommended "[t]hat every agency consider delay * * * in adjudication and rule-making procedures to be detrimental to the public interest." Rep.Pres.Conf. on Admin.Proc. 13 (1955). Criticism of agency delay was an important feature of the recent report of the American Bar Association Committee which studied the Federal Trade Commission at the request of President Nixon, Rep. ABA Comm. to Study the FTC 28–32 (1969).

Specifically, delay by the NLRB has been the subject of increasing judicial comment in recent years. See e. g., Deering Milliken v. Johnston, 295 F.2d 856 (4th Cir. 1961); N.L.R.B. v. Adhesive Products Corporation, 281 F.2d 89 (2d Cir. 1960); N. L. R. B. v. Marcus Trucking Co., 286 F.2d 583 (2d Cir. 1961); N. L. R. B. v. Superior Fireproof Door & Sash Co., 289 F.2d 713 (2d Cir. 1961); N.L.R.B. v. Mastro Plastics Corporation, 354 F.2d 170, 180–1 (2d Cir. 1965); J. H. Rutter-Rex Mfg. Co v. N. L. R. B., 399 F.2d 356 (5th Cir. 1968), cert. granted 393 U.S. 1116, 89 S.Ct. 991, 22 L.Ed. 2d 121 (1969); Clark's Gamble Corporation v. N. L. R. B., 407 F.2d 199 (6th Cir. 1969); N. L. R. B. v. Patent Trader, 415 F.2d 190 (2d Cir. July 29, 1969). See also, Bryant Chucking Grinder Co. v. N. L. R. B., 389 F.2d 565, 574–575 (2d Cir. 1967) (Anderson, J., dissenting); N. L. R. B. v. Marcellus Vault & Sales, Inc., slip op. 3513, 3524–9 (2d Cir. October 1, 1969) (Waterman, J., dissenting). While this body of judicial dissatisfaction has been accumulating, the Board has stressed that it is always striving to improve efficiency and avoid delay. In 1961, a former general counsel of the NLRB wrote that "to discharge its mission an administrative agency must have the confidence of the public it serves, and the first step toward earning such confidence again lies in the expeditious dispatch of the business entrusted to it. * * *" Rothman, Four Ways to Reduce Administrative Delay, 28 Tenn.L.

Rev. 332, 332–3 (1961); *see generally* 33rd Annual Rep. of N.L.R.B. (1969).

Surely where the lapse of time is chargeable to the snail-like pace of the Board there must be some point at which the courts have the power and the duty to withhold a grant of enforcement. I do not know exactly where that line should be drawn, but I am convinced that in this case the Board has gone beyond the permissible limit. Where it is so clear that a proposed order is totally inappropriate due to the situation which now exists, it seems to me that it is the duty of this court to deny enforcement. The action of the majority comes close to saying that passage of time can never make a difference—a position which in my view cannot be good sense and ought not to be the law.

To appreciate just how needlessly protracted has been the history of this proceeding, one need only list the chronology of principal events:

*July 24, 1963.* The union won the second Board-conducted election held at the Staub plant by a vote of 45 to 37, with 5 challenged ballots. The first election, which had been held June 3, 1963, was set aside by the Regional Director, who also ordered the second election. Staub promptly made application to the Regional Director claiming that rumors, described in the majority opinion, had affected the outcome of the election.

*August 19, 1963.* The Regional Director certified Local 39 as the bargaining representative of the Staub plant production and maintenance employees. Staub promptly sought review of the Regional Director's action.

*September 27, 1963.* The Board denied Staub's request for review of the Regional Director's certification and Staub's request for a hearing on its objections based on the rumors on the ground that no substantial factual issues were presented. In the late fall of 1963, the Regional Director issued an unfair labor practice complaint against Staub.

*August 11, 1964.* The NLRB issued its original order directing Staub to

cease and desist from violating sections 8(a) (1), 8(a) (3), and 8(a) (5), and to bargain with Local 39. The Board petitioned this Court for enforcement, and the case was argued here on October 26, 1965.

*March 9, 1966.* This Court upheld the Board's findings as to the 8(a) (1) and 8(a) (3) violations, but, in connection with the 8(a) (5) charges, remanded the case to the NLRB for the purpose of holding a hearing to consider the effect of the rumors on the election. N. L. R. B. v. Staub Cleaners, Inc., 357 F.2d 1 (2d Cir. 1966). On April 29, 1966, the Board remanded the case for a further hearing, which was conducted by a Trial Examiner on June 28, 1966.

*August 23, 1966.* The Trial Examiner rendered his Supplemental Decision holding that the rumor had affected the employees' free choice in the election.

Almost 21 months went by without action by the Board.

*May 13, 1968.* The Board issued its Supplemental Decision and Order, before us on the instant application for enforcement, reversing the Trial Examiner's Supplemental Decision of August 23, 1966, finding refusal-to-bargain violations, and ordering Staub to bargain with Local 39.

Another year passed.

*May 15, 1969.* The Board filed the instant application to enforce its Order of August 11, 1964, which it had reaffirmed in its Supplemental Order of May 13, 1968.

In the present case, although my colleagues characterize the Board's order as a "stale mandate," they are inclined to ignore its effect. At oral argument, the Board was unable to cite to us any case in which comparable proceedings were delayed nearly as long as this. To me, the most disturbing time lag is the period from the Trial Examiner's Supplemental Decision to the Board's Supplemental Decision reversing the Trial Examiner—a period of almost 21 months. I cannot believe that the Board's delay was occasioned by the overwhelming

complexity of issues which the Trial Examiner needed only two months to decide; the issues which they were directed to resolve by our earlier opinion were quite simple. And, on top of this 21-month delay the Board took an additional twelve months before it applied for enforcement of its Supplemental Order of May 13, 1968.

In *Superior Fireproof Door, supra,* Judge Friendly's opinion for a unanimous court scored the "inordinate delay that characterized the course of this proceeding before the Board." *Id.,* 289 F.2d at 723. Discussing a case that was delayed far less than the present action, Judge Friendly stated:

"The average time lapse between the filing of a charge and final decision of the Board is 475 days, see Organization and Procedure of the National Labor Relations Board, Report to the Senate Committee on Labor and Public Welfare, S.Doc. No. 81, 86th Cong., 2d Sess. (1960), pp. 1–2. Here the time lapse was 1015 days, 471 of these intervening between the filing of the charge and the issuance of the complaint. We suggested at the argument that the Board might wish to proffer some explanation of this in its reply brief; it chose not to do so but rather to argue that the delay, while 'unfortunate,' is not prejudicial since no backpay is involved." *Id.*

In reasoning which seems to me to apply here, Judge Friendly went on to argue that the court is bound to recall that the policy of the National Labor Relations Act is to encourage collective bargaining by employees through representatives of their own choosing. *Id.,* at 724: see also, N. L. R. B. v. Adhesive Products Corporation, *supra,* 281 F.2d at 92.

The only way to put an end to such inordinate delays, and to prevent even longer delays, is to tell the Board that the federal courts will not issue an order of enforcement when it is apparent that, because of the lapse of time for which the Board is responsible, such order is wholly inappropriate as it would no long-

er be relevant to the situation which the proceeding was originally designed to correct.

I would deny enforcement of the Board's order.