**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MASTER TOUCH DENTAL LABORATORIES, INC., Respondent.**

No. 139, Docket 32313.

United States Court of Appeals Second Circuit.

Argued Oct. 29, 1968.

Decided Dec. 16, 1968.

David C. Nevins, Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Leonard M. Wagman, Atty., Washington, D. C.), for petitioner.

Herbert A. Lien, New York City, for respondent.

Before LUMBARD, Chief Judge and KAUFMAN and HAYS, Circuit Judges.

HAYS, Circuit Judge:

The National Labor Relations Board petitions for enforcement of an order against Master Touch Dental Laboratories, Inc. The order is based on the Board's findings that the Company violated Sections 8(a)(1), 8(a)(3) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), 158(a)(3) and 158(a)(5) (1964). We grant enforcement in part and deny it in part.

The evidence credited by the Board shows the following:

The Company is engaged in the business of manufacturing and selling dentures and related products in Long Island City, New York. Beginning in 1951, it made collective bargaining agreements with District 65, Retail, Wholesale and Department Stores Union, AFL-CIO, covering all of its production workers. The Company was one of the very few dental laboratories in the area that had been

organized by the Union without opposition from management. The last full-term agreement with District 65 expired on December 31, 1964. When the Union sought to begin negotiations for a new contract in the fall of 1964, Nagy, the Company's president, refused. He stated that the Company would not negotiate until the Union had organized some of the Company's competitors. The Union agreed to increase its efforts to organize companies in the largely unorganized dental industry and to extend the expired contract, containing a union shop clause, for four months, until May 1, 1965. Throughout this four month period, a majority of the Company's employees continued to pay dues to the Union. Attempts by the Union to begin negotiations in April, May and August of 1965 met with Nagy's refusal on the ground that the Union had not organized the rest of the industry.[1]

In November 1965 and in early February 1966, the Union again sought to open negotiations and was refused on the same ground. During February, Nagy called a plant meeting at which he asked each of the Company's seven employees[2] whether he wanted the Union to be his bargaining representative. All the employees indicated that they wanted such union representation.

At a plant meeting on March 8, Nagy urged the Company's seven employees to increase their production in return for which he promised to institute a profit-sharing plan.

The Union called a strike and picketed the Company's premises beginning on March 15. All seven employees stayed away from work.

On March 15 Nagy again refused to negotiate with the Union because the rest of the industry had not been organized.

On March 18, Figueredo, one of the striking employees, requested reinstatement. Nagy rejected the request, stating that there was no work available. However at some time after March 15, Nagy refused to accept work orders that would have provided work for two employees.

*The § 8(a)(5) and § 8(a)(1) violations involving the refusals to bargain, direct bargaining and offer of benefits*

The Board found that the Company violated Section 8(a)(5) and, incidentally, Section 8(a)(1) in refusing to bargain in November 1965, in February 1966 and in March 1966. It found a further Section 8(a)(5) violation in Nagy's meeting with the employees on March 8, 1966 at which he promised to institute a profit-sharing plan if production increased.

■ Although the Union was not certified as the exclusive representative of the Company's employees, the Company recognized it as such during the fourteen year period ending on May 1, 1965. A majority of the employees paid dues to the Union until that date. These facts adequately support the Board's finding that a majority of the employees wanted the Union to represent them on May 1, 1965. On the basis of this finding, the Board properly found the existence of a rebuttable presumption of continuing majority status at the time of the November 1965, the February 1966 and the March 1966 refusals to bargain and at the time of the March 8, 1966 meeting with the employees. See Shamrock Dairy, Inc., 119 NLRB 998 (1957) and 124 NLRB 494 (1959), enforced sub nom. International Brotherhood of Teamsters, v. NLRB, 108 U.S.App.D.C. 117, 280 F.2d

---

1. The unfair labor practice charge was filed on April 21, 1966 and was served on the Company on April 25, 1966. In view of the six months limitation provided by Section 10(b), 29 U.S.C. § 160(b) (1964), these refusals to bargain prior to October 25, 1965 have been noted solely as background.

2. The Board's finding that one of the employees, Manno, was a supervisor is adequately supported by the record.

665 (D.C.Cir.), cert. denied 364 U.S. 892, 81 S.Ct. 224, 5 L.Ed.2d 188 (1960).[3]

■■ The Company could refuse to bargain only if the Union did not in fact represent a majority of the workers during the period from November 1965 through March 1966. The Company argues that the Union had lost its majority support because at least six of the seven employees had stopped paying dues by August 1965.[4] The Union had a very lax policy with respect to the collection of dues, and took no action against members who were as much as a year delinquent in their payments. The failure to pay dues was, in these circumstances, an insufficient basis for rebutting the presumption of majority status. See NLRB v. National Seal Corp., 127 F.2d 776, 779 (2d Cir. 1942).

As additional support for its contention that the Union had lost its majority status by November 1965, the Company cites testimony showing that the Union processed no grievances after May 1, 1965 and that none of the six employees who had ceased to pay dues attended Union meetings between May 1, 1965 and March 1966. The record shows however that no grievances were outstanding after May 1 and that the Union called no meetings of the employees from May 1, 1965, through March 1966.[5]

The Company's argument that the Union lacked majority support is further refuted by the evidence that all the employees affirmed their support of the Union at a meeting called by Nagy in February 1966.

■■ We hold that the evidence sustains the Board's finding that the Union had majority support during the period of the Company's refusals to bargain and that therefore the refusals violated Sections 8(a)(5) and 8(a)(1).

■ The Company also violated Sections 8(a)(5) and 8(a)(1) by calling a meeting of employees and offering them a profit-sharing plan in return for increased production.

### The § 8(a)(3) and related § 8 (a)(1) violation

■ The Board found a Section 8(a) (3) and related Section 8(a)(1) violation in Nagy's refusal to reinstate Figueredo. Figueredo's request for reinstatement was made on March 18, 1966, just after the strike began, and was denied on the ground that no work for Figueredo was available. The Board rejected this defense on the basis of its findings that during this period the Company turned away orders requiring the services of two employees.

Apparently the Board attached no significance to the Trial Examiner's comment during the hearing that "the logical men to assume that [Nagy] would have hired [i. e. if he reinstated any employees] would have been Manno and Winters [and not Figueredo]." This statement was misleading because it indicated that the Company did not have to prove that Figueredo was unqualified for the work the Board found to have been available. In view of this misleading comment of the Trial Examiner, the failure of the Board to find specifically that Figueredo was qualified to do the work it believed was available makes the record inadequate to support the finding of a violation of Sections 8(a)(3) and 8 (a)(1).

---

3. Also supporting the finding of a rebuttable presumption of continuing majority status are cases finding such a presumption with respect to a certified union following the expiration of the certification year. See Brooks v. NLRB, 348 U.S. 96, 104, 75 S.Ct. 176, 99 L.Ed. 125 (1954) (dictum); NLRB v. Superior Fireproof Door & Sash Co., 289 F.2d 713, 718–719 (2d Cir. 1961); Stoner Rubber Co., 123 NLRB 1440, 1445 (1959).

4. No finding was made by the Board or by the Trial Examiner on the question of whether employee McLaren continued to pay dues; he was the Union steward and clearly supported the Union.

5. Like the Board and the Trial Examiner, we draw no inferences from the testimony indicating that the employees respected the Union's picket line and that some actively picketed.

■ In addition, the evidence tends to indicate that no vacancy existed when Figueredo applied for reinstatement. Nagy, his brother and his nephew were able to do the work accepted by the Company. There is no authority to support the Board's contention that an employer must accept additional work offered to it in order to have work available for an employee seeking reinstatement.

*The § 8(a)(1) violation based on interrogation of the employees*

■ According to testimony reasonably credited by the Board, Nagy interrogated the employees regarding the Union at a plant meeting in February 1966 and they all affirmed their desire to be represented by it.

This court stated in Bourne v. NLRB, 332 F.2d 47, 48 (2d Cir. 1964), that "under our decisions interrogation, not itself threatening, is not held to be an unfair labor practice unless it meets certain fairly severe standards."

Three of the standards noted in *Bourne* are not met by the facts of this case. First, Nagy simply asked the employees "whether they wanted the Union." He did not "appear to be seeking information on which to base taking action against individual employees." *Bourne*, supra at 48. Second the questioning took place at a plant meeting and not in an atmosphere of "unnatural formality." *Bourne*, supra at 48. Third, according to the credited testimony, the employees all said they wanted union representation. The "truthfulness of the reply" test of *Bourne*, supra at 48, means that if the employee admits union affiliation there is little ground for holding that he was intimidated. In view of the atmosphere of the questioning and the affirmation by all the employees of support for the Union, we hold that the interrogation did not violate Section 8(a)(1).

The petition for enforcement is granted with respect to the refusals to bargain, the direct bargaining and the offer of benefits. It is denied with respect to the reinstatement of Figueredo and the interrogation of the employees.