NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

Frank GALLARO and Joseph Gallaro
d/b/a Gallaro Bros., and G & G
Foods Co., Respondents.

No. 111, Docket 33512.

United States Court of Appeals
Second Circuit.

Argued Oct. 17, 1969.

Decided Dec. 8, 1969.

Hays, Circuit Judge, dissented in part.

Baruch A. Fellner, N.L.R.B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Elliott Moore, N.L.R.B., Washington, D. C., on the brief), for petitioner.

Harold M. Weston, New York City (Eli Mellan, Bronstein, Miller & Mellan, Mineola, N. Y., on the brief), for respondents.

Before FRIENDLY, HAYS and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

Frank and Joseph Gallaro are partners in a retail food store, doing business under the name G & G Foods Co., in Brooklyn, New York. The Retail Food Clerks Union, Local 1500, Retail Clerks International Association, AFL-CIO, was certified as the exclusive bargaining agent for the Gallaro employees on November 29, 1965, following a consent election held on October 25 which the Union had won by an eight to seven vote. A collective bargaining agreement, effective as of February 1, 1966, was subsequently entered into by the Gallaros and the Union. The contract, which contained no reopening or automatic renewal clause, was to terminate by its own terms on January 31, 1967.

On January 24, 1967, Arthur Wolfson, the Union vice president, called Carmine Gallaro [1] by telephone to arrange for negotiations for a new agreement. Car-

---

1. Carmine Gallaro, brother of Frank and Joseph Gallaro, acts as the business agent for G & G Foods.

mine responded that he had not realized that the existing contract expired so soon, but that he would, in any event, need to discuss the matter with his brothers. When Wolfson called again on January 26 or 27, Carmine stated that he had not, as yet, had an opportunity to discuss the matter with them.

Meanwhile, one of the employees, Michael Ferrara, had been circulating among the employees a petition indicating that they no longer desired union representation.[2] On January 27, when he showed the petition to Carmine Gallaro, Ferrara had obtained four signatures. Carmine expressed neither approval nor disapproval of the petition, but did state, " * * * if you people want to be represented among yourselves, or whatever you are trying to do, you have to have a majority of the employees."

By January 30th Ferrara had secured the signatures of seven of the ten employees in the bargaining unit and, after dating the petition, delivered it to Carmine. Later that day Wolfson again contacted Carmine relative to a date for negotiations but Carmine once more demurred, and indicated that he was not sure that the Union still had the support of the employees.

That same evening[3] the employees held a meeting[4] at the store after working hours. They asked to meet with the Gallaros and requested a 25-cent an hour pay increase. It had been the long-standing practice at the store to give an annual wage increase, and the employees were concerned that none had been granted since the previous February when the Union contract was executed. The request was rejected by Carmine, who indicated that even though he was willing to listen, he could not promise anything because the meeting might not be legal. The employees then stated that they would settle for a 15-cent an hour increase for the first year with an additional ten cents for the second year. Carmine again expressed doubts as to the legality of the meeting, but stated that the increases would be granted "if it is perfectly legal." No date was set for the determination of the question of the increases. Although the trial examiner found that Ferrara at one point threatened to "stick with the union" if the requests were not granted, this was not the primary emphasis of the meeting.

The following day, January 31, Wolfson again contacted Carmine and asked if the Gallaros were ready to negotiate. Carmine told him that the employees had decided to reject the Union; and, therefore, no negotiations were commenced. The employees' petition had been given to the company's attorney and on February 3, 1967, an RM-representation petition was filed by him with the N.L.R.B. on behalf of the Gallaros. On February 7, the Union filed the unfair labor practice charges upon which the petition in this case is based. The RM-representation petition was then dismissed by the Board because of the pendency of the unfair labor practice charges.

2. The petition was printed on a sheet of stockroom notepaper and read as follows: "We the undersign of G.G. Foods of 490 Henry St Brooklyn do not want to be represent by Loc. Retail Food Clerks Union anymore"
Ferrara, who had in the past displayed anti-union feelings, apparently initiated the petition.

3. There was a dispute between the parties as to exactly when this meeting took place. While Wolfson declared that the meeting was held on the 30th, the respondents contend that it did not occur until at least two weeks later. The sole basis for placing the meeting on the 30th was Wolfson's testimony, credited by the Trial Examiner, that in a telephone conversation on January 31 Carmine stated that he had met the night before with the employees. Carmine categorically denied making this statement; and the testimony of all witnesses who were present at the meeting placed the meeting in February, after the Union contract had expired.

4. All of the employees in the bargaining unit, with possibly one exception, were present at the meeting.

On February 25th the Gallaros granted the employees a 15-cent an hour wage increase, retroactive to January 30, 1967. They also continued the health benefits which had been in effect prior to the Union contract.

On this evidence Trial Examiner Lightner found that the Gallaros had violated §§ 8(a) (1) and (5) of the Act, 29 U.S.C. § 158(a) (1) and (5), based upon Carmine's conduct when contacted by Wolfson on January 24th, the January 20th meeting between the Gallaros and the employees, and the February 25th wage increase. The Board, without discussion, adopted the Trial Examiner's findings, conclusions and recommendations,[5] and issued a cease and desist order together with orders to post the standard notice for sixty days, to bargain with Local 1500, and to make certain back payments to the Union's welfare fund.

■ The Board's contention that Carmine's response to Wolfson's January 24th telephone call, particularly when viewed in light of Gallaros' subsequent actions, constituted a refusal to bargain within the meaning of § 8(a) (5) is untenable. Wolfson's call was the first contact made by the Union concerning negotiations for a new contract. It has not been shown that Carmine had any authority to answer other than as he did, and he was not acting arbitrarily when he stated that he would have to take the matter up with his brothers, the co-owners of the business, before he could agree to a specific date for such negotiations. Cf. NLRB v. River Togs, Inc., 382 F.2d 198, 296–207 (2 Cir. 1967).

■ The Union's certification year had expired in November of 1966, but there remained the rebuttable presumption that the union continued to represent a majority of the employees, Brooks

v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954). After the expiration of the certification year, an employer is free to refuse to bargain with a union if there is a good faith doubt as to the union's continuing majority status, though otherwise he has a duty to negotiate about a new contract. The presumption here concerning the Union's continuing majority status was weak at best. The Union won the first election by a margin of only one vote. During the certification year the number of employees was reduced by five, which factor taken together with the fact that the petition had been instituted and circulated by the employees themselves, without employer encouragement or intervention, makes it clear that the presentation of a petition signed by 70 per cent of the members of the unit adequately dispelled any supposition that the union still maintained the allegiance of a majority of the workers.[6] This was sufficient to create a good faith doubt and justify the subsequent refusal to bargain.

■ The charge that the January 30th meeting constituted an unfair labor practice poses a somewhat more difficult problem, because even though an employer is free to refuse to bargain with a union once the certification year is over, if there is a good faith doubt as to the union's continuing majority status, Brooks v. NLRB, *supra*; see also NLRB v. Master Touch Dental Laboratories, Inc., 405 F.2d 80, 82–83 (2 Cir. 1968); NLRB v. Rish Equipment Co., 407 F.2d 1098, 1100–1101 (4 Cir. 1969); NLRB v. Gulfmont Hotel Co., 362 F.2d 588, 589 (5 Cir. 1966), it does not necessarily follow that the employer is also free to negotiate with someone else. The difficulty, of course, arises in determining what evidence is sufficient so to rebut the presumption as to permit the employer to bargain with someone other

5. The Trial Examiner's recommended order was adopted verbatim with the exception that the Board substituted its own notice to be posted by the employer.

6. This case differs from Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 64

S.Ct. 830, 88 L.Ed. 1007 (1944), in which the employer's independent bargaining sessions with his employees were held prior to the termination of the certification year.

than the union whose certification had terminated.

■ Where, as here, the meeting was made up of all of the employees, with the possible exception of one, and was held solely at the instigation of the employees, without there being evidence of any suggestion or encouragement by the employer, who was present only when called in from time to time by the employees to hear and consider their demands, we conclude that the employer needed no additional evidence, other than the petition described above, to support the existence of a good faith belief that the union no longer represented the employees. There was, therefore, here sufficient proof, not only to create a good faith doubt, but to justify the employer in the belief that more than a majority of the employees no longer wanted the union to continue as their representative. It was, therefore, under these circumstances permissible for the employees to present demands to the employer and for the latter to consider and answer them.

We limit this holding to the particular facts of this case where the certification year of the union had ended, a majority of the employees had plainly and on reliable evidence signified that they no longer wanted the union to represent them and where there was no evidence that the employer had instigated, encouraged or influenced the employees' rejection of the union. It is also important the the desire to terminate the representation by the union was not inspired by any outside source, but was a spontaneous, grass-roots movement by the employees themselves. It is not the purpose of this decision to open doors long since closed or to give assurance to employers that they are free to instigate negotiations unilaterally with their employees under the thin guise that the employers are simply dealing with an endemic disaffection with the union and thereby discourage and destroy employees' interest in union representation.

■ In cases where the union's certification year has run out and the employer is desirous of negotiating with someone other than a majority of its own employees, such as another labor union, then, he must first make certain that he is possessed of reliable proof that a majority of the employees want to terminate their relationship with the old union and elect to be represented by the new union. It would be the better and safer course for him to petition the Board in a decertification proceeding; but as we have noted, this is a time consuming process and may raise up practical problems of great difficulty for an employer. He may avoid the Board and embark directly upon negotiations with someone other than the union, but in so doing he assumes the risk that his conclusions may have been incorrect. See NLRB v. Superior Fireproof Door & Sash Co., 289 F.2d 713, 719 (2 Cir. 1961); Ruby v. American Airlines, Inc., 323 F.2d 248, 254 (2 Cir. 1963), cert. denied, 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611 (1964). We simply hold that in the circumstances of this case the employer was justified in negotiating directly with the employees after being presented with the petition.

■ The actual conduct at the meeting does not change this result. Although the Board attaches great weight to the fact that Ferrara at one time during the meeting threatened to "stick with the union" if the demands were not met, this remark is better treated as pressure applied during the heat of negotiation rather than proof that the employer was attempting to entice the employees away from the union with illegal inducements. Absent evidence of misconduct by the employer, this simple statement by Ferrara does not convert the meeting into a prohibited activity.

■ The fact that the Gallaros granted a wage increase to the employees on February 25th, does not conclusively prove the Board's position.[7]

---

7. The fact that the wage increase covered January 30th and 31st, which came within the contract period, does not change the result. The wage increase was agreed

By that date the contract had long since terminated and a large majority of the employees had repudiated the Union so that the employer had no duty to refrain from granting a wage increase. Stoner Rubber Co., 123 N.L.R.B. 1440 (1959); see NLRB v. Superior Fireproof Door & Sash Co., *supra*. This is particularly true where, as in the present case, the union contract terminated by its own terms and the employer had been in the habit of giving annual increases. Cf. NLRB v. Yokell, 387 F.2d 751, 756 (2 Cir. 1967). We are, therefore, of the opinion that the respondents did not, under the circumstances, violate the Act when they granted the wage increases.

The present case is not one where the employer has a long history of anti-union activity or has used the threat of a RM petition to obtain new concessions from the Union. Cf. NLRB v. Little Rock Downtowner, Inc., 414 F.2d 1084 (8 Cir. 1969); Bally Case & Cooler, Inc. v. NLRB, 416 F.2d 902, (6 Cir. October 17, 1969).

The position taken by the dissent would convert the presumption of a continuing majority status for a reasonable time, following the termination of a contract, into a conclusive rather than a rebuttable presumption. As a result, even in cases as strong as this one is, employees could be freed from the incubus of a union, the representation contract with which has expired and further affiliation with which they no longer want, only through an order following the granting of a decertification petition by the Board. The evidence in this case that all ten employees desired to terminate the relationship with and representation by the union was uncontradicted and unequivocal. While the dissent concerns itself with the interests of the union versus the employer and vice versa, consideration should be given to the interests of the employees. As free contracting parties they had, under the circumstances of this case, a right to bargain directly with the employer, themselves (after all there were only ten employees), or to seek a new bargaining representative. The doctrine advanced by the dissent would compel them to negotiate through the repudiated union or remain in a state of suspended animation for an indefinite period with no one to negotiate or speak on their behalf.

We are satisfied on the record as a whole that the Board's conclusions are not supported by substantial evidence and enforcement of its order is denied.

HAYS, Circuit Judge (concurring and dissenting):

While I concur with the majority in holding that the employees' petition created sufficient good faith doubt of the Union's continuing majority status to justify the employer's refusal to bargain, I cannot agree with that part of the opinion which holds that the employer was also justified in negotiating directly with the employees.

The majority relies on NLRB v. Superior Fireproof Door & Sash Co., 289 F.2d 713 (2d Cir. 1961), which held that, after the end of the certification year, an employer who has good faith reason to believe that his employees' bargaining representative has lost its majority status may not only refuse to bargain with that agent, but may also negotiate with another group believed to have majority support, although he undertakes the latter at the risk that his assessment of the situation is not only reasonable but right. I believe that decision failed to take into account the policies underlying the presumption of continuing majority status, and I would hold that it is not controlling in the circumstances of this case.

In support of the proposition that reasonable doubt as to continuing majority status justifies negotiations with others, the court in *Superior Fireproof* relied

to cover the "first week of February," which began on a Wednesday, as a result of which the pay week included the last two days of January. There was no evidence of any intention by the employers to subvert the union contract.

on NLRB v. Minute Maid Corp., 283 F.2d 705, 95 A.L.R.2d 660 (1960); Stoner Rubber Co., 123 N.L.R.B. 1440 (1959); American Laundry Machine Co., 107 N.L.R.B. 1574, 1583 (1954); and National Carbon Division, 105 N.L.R.B. 441 (1953), all of which, with the exception of the *American Laundry* case, establish only that an employer may grant unilateral wage increases or changes in conditions of employment when possessed of such doubt. And in *American Laundry,* the negotiations took place with the Local Committee which had previously participated in bargaining sessions along with a representative of the International with which the Local was affiliated. Not only is this very different from bargaining with the employees directly but in *American Laundry* the Board relied on the fact that a decertification petition had been filed before such bargaining began. This is, in my view, a particularly significant distinction.

The opinion in *Superior Fireproof* with no explanation beyond citation to these cases, greatly expanded the previously recognized exception to the employer's duty to bargain collectively with the chosen representatives of his employees. That limited exception as stated in Brooks v. NLRB, 348 U.S. 96, 104, 75 S.Ct. 176, 99 L.Ed. 125 (1954) merely permits an employer after the close of the certification year to refuse to bargain with a union as to whose continuing majority status he has a good faith doubt.[1]

The scope of the exception to the duty to bargain which *Brooks* allows must be considered against the background of the well-established presumption of continuing majority status and the familiar axiom that the duty to bargain with the employees' chosen representative "exacts 'the negative duty to treat with no other.'" Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 683–684, 64 S.Ct. 830, 833, 88 L.Ed. 1007 (1944), citing NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 44, 57 S.Ct. 615, 81 L.Ed. 893 (1937).

The presumption of continuing majority status serves not only to protect for a reasonable period a bargaining relationship once rightfully established in order that it may be given a fair chance to succeed, Franks Bros. Co. v. NLRB, 321 U.S. 702, 705, 64 S.Ct. 817, 88 L.Ed. 1020 (1943), but also prevents an employer from arrogating to himself the determination of what in essence is a representation dispute, see Midwest Piping and Supply, Inc., 63 N.L.R.B. 1060, 1070 (1945).

I am persuaded that something more than good faith doubt is required to sanction negotiation with the employees directly. For an employer to enter into negotiations with a group of employees he must go beyond a determination of loss of majority status. He must decide where majority support now lies.

I would therefore hold that the presumption of continuing majority status in this situation means that an employer cannot actively negotiate with someone other than the former majority representative until, at the very least, he has evidence as to who now represents the majority more formal and better protected from subtle and improper influences than the petition presented in this case. Compare Ruby v. American Airlines, Inc., 323 F.2d 248 (2d Cir. 1963), cert. denied, 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611 (1964) where bargaining with a substituted agent took place only after a mediator had found acceptable authorization cards from 84% of the eligible employees.

1. See Celanese Corp. of America, 95 N.L.R.B. 664 (1951).