NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MERCY COLLEGE, Respondent.

No. 831, Docket 75–4232.

United States Court of Appeals, Second Circuit.

Argued April 21, 1976.

Decided June 9, 1976.

---

David F. Zorensky, Atty., N. L. R. B., Washington, D. C. (Elliott Moore, Deputy Associate Gen. Counsel, John S. Irving, Jr., Gen. Counsel, Washington, D. C., on the brief), for petitioner.

Marvin Dicker, New York City (Proskauer, Rose, Goetz & Mendelsohn, Saul G. Kramer, Laura E. Drager, New York City, on the brief), for respondent.

Before MOORE, FEINBERG and GURFEIN, Circuit Judges.

FEINBERG, Circuit Judge:

In this hotly-contested matter, the National Labor Relations Board petitions for enforcement of its order requiring Mercy College, a private, non-profit institution, to recognize the Mercy College Faculty Council (the Union) as the bargaining agent for a unit consisting of all full-time and regular part-time members of the faculty. 219 N.L.R.B. No. 5. This proceeding is only one of the many evidencing the recent trend toward unionization of faculties at the university level.[1] Several questions as to unit eligibility are raised before us that are in some instances perplexing, but we do not find it necessary or appropriate to resolve them. We conclude that there was a serious procedural error in the Board proceeding that affects the validity of the order the Board seeks to enforce. We therefore remand to the Board for correction of that error and for further consideration.

I

Although this case comes to us in the framework of an alleged unfair labor practice, the basic issues stem, as is frequently the case, from the representation proceeding that led to certification of the Union. This began about three years ago when the Union filed a certification petition with the Board. After some skirmishing about the proper name of the Union on the ballot,[2] the Board's Acting Regional Director ordered an election in a unit, essentially agreed upon by the parties, consisting of "[a]ll full time and regular part time members of the faculty," including department chairmen and certain librarians, but with specified exclusions, the most important of which for our purposes were "administrative personnel" and "supervisors as defined in the Act."[3] The election took place in November 1973, and could not have been closer. Forty-two votes were cast for the Union and 41 against. The Board and the College challenged three voters, one of whom, Neil Judge, has turned out to be crucial, as will be seen below. The College also challenged one ambiguous ballot, which was included in the total of 42 for the Union, and filed various objections to the Union's pre-election conduct.

The Regional Director conducted a lengthy investigation of the issues raised by the challenges and the objections. In the course of that ex parte inquiry, the College

---

1. See, e. g., *NLRB v. Wentworth Institute*, 515 F.2d 550 (1st Cir. 1975); *New York University*, 221 N.L.R.B. No. 176 (1975); *Northeastern University*, 218 N.L.R.B. No. 40 (1975); *Fordham University*, 214 N.L.R.B. No. 137 (1974); *New York University*, 205 N.L.R.B. 4 (1973); *Florida Southern College*, 196 N.L.R.B. 888 (1972); *Adelphi University*, 195 N.L.R.B. 639 (1972); *Fordham University*, 193 N.L.R.B. 134 (1971); *C.W. Post Center of Long Island University*, 189 N.L.R.B. 904 (1971). Prior to its decision in *Cornell University*, 183 N.L.R.B. 329 (1970), the Board had held that it was without jurisdiction over private universities. *Trustees of Columbia University*, 97 N.L.R.B. 424 (1951). For discussion of the problems faced by the Board in dealing with faculty bargaining units, see Kahn, The NLRB and Higher Education: The Failure of Policymaking Through Adjudication, 21 U.C.L.A. L.Rev. 63 (1973); for a discussion

of the impact of faculty collective bargaining on colleges and universities, see Benewitz, Bargaining in Higher Education, 27 N.Y.U. Ann. Conf. on Labor 43 (1975).

2. This issue is dealt with below.

3. The full description of the unit was:

All full time and regular part time members of the faculty employed by the Employer including department chairmen, assistant library director and reader services librarians but excluding administrative personnel, the president, assistants to the president, deans and assistant deans, directors and assistant directors of academic advisors, director of the library, all other employees, guards, watchmen and supervisors as defined in the Act.

submitted to the Director affidavits in support of its position. In March 1974, the Director dismissed all the College's objections and directed that one of the challenged votes (that of Neil Judge) be counted. The College submitted a timely request for review to the Board, in which it again pressed its challenge to the Judge ballot (which had not yet been counted), objected to the ambiguous ballot (which had been counted for the Union), objected to an alleged union campaign misrepresentation and sought an evidentiary hearing on these issues. In April 1974, the Board granted review only as to the ambiguous ballot. The College then sought reconsideration of Neil Judge's eligibility, in light of the Supreme Court's then recent decision in *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), which dealt with the definition of "managerial employees" under the Labor Act. The Board denied this request for reconsideration. In August 1974, the Board held that the ambiguous "yes" vote was void, reversing the Regional Director. 212 N.L.R.B. 925.[4] This made the tally 41 votes for, and 41 votes against, the Union. The Board remanded the case to the Regional Director to open and count the ballot of Neil Judge. His vote for the Union restored the vote to 42–41, in the Union's favor. The Union was certified on August 30, 1974.

Thereafter, the Union requested bargaining, and the College refused. The Union filed unfair labor practice charges, the Board issued a complaint, and the College admitted its refusal to bargain but contested the validity of the election and the Union's certification and asserted various affirmative defenses. The Board's General Counsel then moved for summary judgment, which the Board granted over the College's protest. The Board's order, which it now seeks to enforce, found that the College's admitted refusal to bargain with the Union violated sections 8(a)(5) and (1) of the Act.

## II

In response to the Board's petition to enforce its order, the College raises six points. It argues that (1) Neil Judge was ineligible to vote because he was an administrator, a manager and a supervisor; (2) misrepresentation in a union handbill destroyed the required laboratory conditions for the election; (3) at the very least, the College was entitled to an evidentiary hearing on these two issues; (4) the Union's name on the ballot was misleading to the voters; (5) the Board violated the Act's quorum requirements; and (6) expansion of the unit since the election, the closeness of the election and the resulting serious legal issues require, at the very least, a new election. Since we believe that the failure to hold an evidentiary hearing as to Judge's eligibility was a serious error requiring a remand of these proceedings to the Board, we turn to that issue first.

The College argues to us, as it did to the Board, that Judge was ineligible to vote in the election because he was an administrative, managerial and supervisory employee or at least fell into one of these categories. The three concepts are related and blend into one another in a way difficult to define. The term "managerial employee" was not used in the original Wagner Act, and does not appear in the 1947 Taft-Hartley amendments to the Labor Act. Nevertheless, the Board has developed the concept, and the pertinent cases and legislative history are traced in great detail in the decisions both of the Supreme Court in *NLRB v. Bell Aerospace Co.*, supra, 416 U.S. at 274–90, 94 S.Ct. 1757, and of this court in the earlier stage of that case, 475 F.2d 485, 488–94 (1973). A frequently cited definition is that "managerial employees" are those who "formulate and effectuate management policies by expressing and making operative the decisions of their employer," quoted in *Bell Aerospace,* supra, 416 U.S. at 288, 94 S.Ct. at 1768.[5] The Supreme Court held in *Bell Aerospace* that

---

4. The decision was by a three-member panel of the Board, with one member dissenting.

5. The quotation is from the Board's decision in *Palace Laundry Dry Cleaning,* 75 N.L.R.B. 320, 323 n.4 (1947).

all managerial employees are excluded from the protections of the National Labor Relations Act. Id. at 275, 94 S.Ct. 1757. The Taft-Hartley Act defined the term "supervisor," 29 U.S.C. § 152(11),[6] and explicitly excluded those so defined from the protections of the Act. 29 U.S.C. § 152(3).[7] See *Bell Aerospace,* supra, 416 U.S. at 274 n.4, 94 S.Ct. 1757. The legislative history of the Taft-Hartley Act, summarized at 416 U.S. at 279–84, 94 S.Ct. 1757, suggests that the explicit exclusion of "supervisors" was not extended to cover those categorized as "managerial employees" because Congress regarded the latter "as so clearly outside the Act that no specific exclusionary provision was thought necessary." Id. at 283–84, 94 S.Ct. at 1766.

The term "administrative personnel," in contrast, does not appear in the statute, nor are we cited to any decision holding the category an implicit exclusion from the Act. The parties agreed, however, that "administrative personnel" were to be excluded from the unit in this case.[8] The Regional Director correctly observed in his March 1974 opinion that "the record sheds no very clear light on the meaning which the parties intended to give to the term."

The question whether a particular employee falls within one of these categories ordinarily depends upon individual facts, which may vary from case to case. It is, of course, true that issues of general application may arise, as happened in *Bell Aerospace,* supra, where the question was whether "managerial employees" could be covered by the Labor Act if their job responsibilities created no conflict of interest with membership in a labor organization. A similar broad issue is raised in this case

by the Regional Director's use of a rule that in order to be classified as a supervisor an employee must supervise other unit employees or spend more than 50 per cent of his working time supervising non-unit employees.[9] The College says that there is no support for such a rule in the statute, its legislative history or the cases.

But most of the time, the issue whether an employee is excluded from the unit as a supervisor, manager or administrator is purely factual. In large part, this case is no exception. At the time of the election, Judge was Director of Athletics at the College and responsible for development of its athletic program. In support of its position that Judge does not belong in the unit, the College stresses the following: Judge administers the program under an administrative letter of appointment similar to the College's agreement with its officers and deans, all of whom were excluded from the unit. His appointment is terminable at will, while faculty members receive teaching contracts for a fixed term. Judge is paid as an administrator, prepares his department's budget, reports to an administrative dean, is listed in the catalog as an administrator and does not attend faculty meetings. Judge hired a women's basketball coach and notified the appropriate dean only after the fact. According to the College, he obtained the aid of an assistant basketball coach and a tennis coach, and directs the work of all these coaches.

The Board contends that on an annual basis Judge spent well over 50 per cent of his time in non-administrative work, coaching and teaching, and was, therefore, a "multi-function" employee, with a sufficient community of interest with those in

---

6. This section provides:

   The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees or responsibility to direct them, or to adjust their grievances or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

7. "The term 'employee' . . . shall not include . . . any individual employed as a supervisor . . . .."

8. See note 3 supra and accompanying text. The proposed unit also excluded "supervisors as defined in the Act," but did not refer to "managerial employees."

9. Cf. *New York University,* supra note 1, 205 N.L.R.B. at 8; see also *Adelphi University,* supra note 1, 195 N.L.R.B. at 644.

the unit to be included within it. See *Florida Southern College*, 196 N.L.R.B. 888, 889–90 (1972); *Berea Publishing Co.*, 140 N.L.R.B. 516, 519 (1963). The Board argues that the catalog listings are ambiguous, in that others listed as administrators were included in the unit, and in any event that Judge's duties, rather than his title, are controlling. Accordingly, the Board stresses that in addition to coaching, which the Board apparently regards as analogous to teaching, Judge was found by the Regional Director to have taught six credit hours of conventional classes per semester. The Board also argues that Judge exercised no responsible authority over unit personnel and his supervision of non-unit employees took up well below 50 per cent of his working time. The Board relies upon the Regional Director's investigation, which established that, contrary to the College's position, Judge did not hire and exercised no real authority over the tennis coach.[10] Finally, according to the Board, Judge was not entrusted with any significant managerial functions as Director of Athletics. He was responsible only for routine matters like preparing the department's budget and scheduling sporting events and spent most of his time teaching and coaching.

Merely summarizing these conflicting contentions indicates how predominantly factual are the issues as to Judge's eligibility even though, as indicated above, it may be necessary ultimately to resolve some broader questions of law affecting his status. It is for this reason that many courts, including our own, have stressed the limited scope of review when the Board has determined issues of unit eligibility[11] and supervisory status[12] of particular employees, and representation questions in general.[13] But such appropriate reluctance to substitute judicial judgment for that of the Board is based upon the assumption that the Board has obtained a proper factual record. The College contends strenuously that this was not done here. In order to state its argument fairly, it is necessary to backtrack a little.

When the College raised its objections to the election, the Regional Director conducted an investigation. This was the ordinary procedure,[14] although we are told that the 16 weeks necessary to complete the investigation was unusual. In that period, the College had an opportunity to, and did, submit affidavits to the Director embodying its own version of the facts regarding Judge's duties.[15] The Director's opinion relied in

10. The tennis coach is a faculty member and in the unit; the other coaches, whom the Board concedes are supervised by Judge, are students at the College.

11. *NLRB v. Staiman Bros.*, 466 F.2d 564, 566 (3d Cir. 1972); cf. *Packard Motor Car Co.*, 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); *Tidewater Oil Co. v. NLRB*, 358 F.2d 363, 365 (2d Cir. 1966), is not to the contrary. We there ruled that where the parties agree "that the appropriate unit will include given jobs, the Board . . . is limited to construing the agreement according to contract principles," and found that "in applying job categories to given individuals," the Board had violated what "the parties clearly had in mind." Here, however, the record is not clear on the meaning the parties intended to give the term "administrative personnel." We agree that "[a]bsent clear evidence of the parties' intention to apply some other test," the Board may resolve this eligibility question as it resolves eligibility questions in general, and its "wide degree of discretion" is restored. *Knapp-Sherrill Co. v. NLRB*, 488 F.2d 655, 659 (5th Cir.),

cert. denied, 419 U.S. 829, 95 S.Ct. 50, 42 L.Ed.2d 53 (1974).

12. *NLRB v. Metropolitan Life Ins. Co.*, 405 F.2d 1169, 1172 (2d Cir. 1968); *NLRB v. Doctors' Hospital of Modesto, Inc.*, 489 F.2d 772, 776 (9th Cir. 1973); *Warner Co. v. NLRB*, 365 F.2d 435, 437 (3d Cir. 1966); *NLRB v. Swift & Co.*, 292 F.2d 561, 563 (1st Cir. 1961).

13. We have noted that

The conduct of representation elections is the very archetype of a purely administrative function, with no *quasi* about it, concerning which courts should not interfere save for the most glaring discrimination or abuse.

*NLRB v. Olson Bodies, Inc.*, 420 F.2d 1187, 1189 (2d Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 966, 28 L.Ed.2d 237 (1971).

14. 29 C.F.R. § 102.69(c), (d).

15. The College submitted affidavits of Donald Grunewald, President of the College, and Walter McCarthy, its treasurer. Only the latter dealt with Judge.

significant part on evidence supplied ex parte by Judge.[16] In its request for review to the Board, the College argued that due process demanded, and the rules and regulations of the Board require, that where "substantial and material" issues of fact relating to the validity of a representation election arise, a hearing should be conducted at some stage of the administrative proceeding.[17] The Board denied this portion of the request for review. After the Union had been certified and the College refused to bargain, it made the same arguments about Judge in the unfair labor practice proceeding as it had before in the representation context. Once again, the Board denied the College's request for an evidentiary hearing and granted summary judgment.

From our examination of the record, we find at least three significant factual conflicts bearing on Judge's eligibility: (1) The Regional Director found that Judge taught six credit hours per semester, while the affidavit from Walter McCarthy, the College Treasurer, supra note 15, says he taught one three-credit course. (2) The Director found that Judge spends 65–70 per cent of his time teaching, but the McCarthy affidavit says he spends "most of his time" developing the inter- and intra-mural sports program of the College. The affidavit may be conclusory and subject to differing interpretations (the Board suggested at argument that some time Judge spent coaching, which the Board would regard as teaching, may be included in McCarthy's estimate),

but it directly contradicts the Director's finding on a significant factual issue. (3) The Director's finding that Judge did not enlist the aid of the teacher/tennis coach who was a unit member, and so was not his supervisor, directly contradicts McCarthy's affidavit.

We believe that each of these—and certainly all of them together—constituted "substantial and material" issues of fact under the Board's own rules, see note 17 supra, which should not have been determined without an evidentiary hearing. The Regional Director made a detailed analysis of Judge's time commitments and supervising authority, apparently based largely upon evidence, taken ex parte, that is contradicted in some respects by the McCarthy affidavit. See note 16 supra. We cannot say that these disputes are immaterial to the issue of Judge's eligibility. Certainly the affidavit from a college official, presumably familiar with Judge's duties suffices to raise an issue requiring a hearing at which the evidence relied on by the Director can be tested. Since the outlines of the categories of "supervisor," "administrator" and "manager" are so amorphous, and the question of Judge's placement in those categories is peculiarly factual, the Board's procedures must be scrupulously fair to the College, particularly when the issue is determinative of the election.

Accordingly, we remand the proceeding to the Board for an evidentiary hearing on the eligibility of Judge to vote in the unit.

---

**16.** The Regional Director's opinion contains such statements as:

In point of fact, *according to Judge*, he teaches 6 credit hours per semester . . . . *Judge states* that during 1972–73 he had minimal or no duties with respect to tennis . . . .

Thus during the month of September 1973, *he [Judge] estimates* he spent the majority of his work week in administrative duties . . . . However, from October 1973 to mid-March 1974, which *Judge labels* his basketball season, he spends . . . much more [time] in coaching . . . .

(Emphasis added.) All of these examples of explicit reliance on information supplied by

Judge involve critical factual issues on which there is some dispute, see below.

**17.** . . . . if it appears to the regional director that substantial and material factual issues exist which, in the exercise of his reasonable discretion, he determines may more appropriately be resolved after a hearing, he shall issue . . . a notice of hearing on said issues . . . .

29 C.F.R. § 102.69(d). See *NLRB v. Medical Ancillary Services, Inc.*, 478 F.2d 96, 99 (6th Cir. 1973); *NLRB v. Bata Shoe Co.*, 377 F.2d 821, 825–26 (4th Cir.), cert. denied, 389 U.S. 917, 88 S.Ct. 238, 19 L.Ed.2d 265 (1967); *ILG-WU v. NLRB*, 339 F.2d 116, 125–26 (2d Cir. 1964).

## III

Since the case must be remanded for additional evidence as to Judge, we do not think it appropriate at this time to deal further with the merits of the issues affecting his eligibility. The questions raised are difficult, e. g., whether there is legal justification for the Board's so-called 50 per cent rule, and, if there is, whether it applies equally to the supervisory, managerial and administrative categories. And here there is the additional complexity of applying terms from the ordinary industrial hierachy to the university context. The Board's findings as to eligibility are entitled to great weight, although we have on occasion reversed them in the past. E. g., *NLRB v. Metropolitan Life Ins. Co.*, 405 F.2d 1169, 1172–73 (2d Cir. 1968). We will defer consideration of the eligibility issues raised here at least until we are sure that we have a full factual record. Moreover, it may well be that after the further hearing, the Board will change its mind about Judge or, failing that, will decide to hold another election. We by no means order it to do so. We understand the danger of encouraging employers to engage in delaying tactics "in the hope that over a period of time a union will lose its majority status." *NLRB v. Patent Trader, Inc.*, 426 F.2d 791, 792 (2d Cir. 1970) (en banc). But the circumstances here are unusual and might call for an exception that proves the rule we endorsed in *Patent Trader*.

■ Finally, we do think it appropriate to note that we find the College's other arguments unpersuasive. The College claims that the Board violated the quorum requirements of 29 U.S.C. § 153(b) as interpreted in *KFC National Management Corp. v. NLRB*, 497 F.2d 298 (2d Cir. 1974). There is only one instance in which there is any basis in the record for believing that the Board did not have a proper quorum, and that instance occurred before our decision in *KFC*, which we have stated not to have retroactive effect. *NLRB v. Newton-New Haven Co.*, 506 F.2d 1035, 1038 (2d Cir. 1974). At any rate, the Board's subsequent reaffirmance of that order "*nunc pro tunc*,"

after reconsideration by a full panel, accomplished all that was necessary. As for the College's other arguments, the Union handbill was in no way incorrect or misleading, and the Acting Regional Director's finding, after a hearing, that the Union's name was in fact as it was stated on the ballot is supported by substantial record evidence.

Enforcement denied. Case remanded to the Board for further proceedings consistent with this opinion.