**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ALVIN J. BART AND CO., INC., Respondent.**

**No. 500, Docket 78–4115.**

United States Court of Appeals, Second Circuit.

Argued Jan. 15, 1979.

Decided May 21, 1979.

Hugh P. Husband, Jr., New York City, for respondent.

Paul J. Spielberg, Washington, D.C., Deputy Associate Gen. Counsel, Washington, D.C. (Sandra L. Elligers, John S. Irving,

Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate General Counsel, N.L.R.B., Washington, D.C., of counsel), for petitioner.

Before WATERMAN, GURFEIN, and VAN GRAAFEILAND, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its Decision and Order, 236 N.L.R.B. No. 17 (1978), adopting the Administrative Law Judge's findings and conclusions that respondent violated section 8(a)(5) of the National Labor Relations Act (29 U.S.C. § 158(a)(5)) by refusing to bargain with Local 51 (the Union),[1] by failing to provide the Union with the names and addresses of unit members, and by unilaterally increasing the wages of unit members. Respondent contends that its refusal to bargain was justified by its good faith reasonable doubt of the Union's continuing majority status, based in part upon a union-repudiating petition signed by a clear majority of the unit members. The Administrative Law Judge refused to credit respondent's claim of reasonable doubt because the petition was drafted and circulated by one Simmons, who was found to be a supervisor under section 2(11) of the Act (29 U.S.C. § 152(11)). In view of the lack of substantial evidence to support the finding that respondent did not possess a good faith reasonable doubt as to the Union's majority status, we deny enforcement of the Board's Order.

Respondent is a commercial printing company located in New York City. On January 7, 1972, the N.L.R.B. conducted an election to determine whether Local 51 would become the collective bargaining agent for a unit consisting of the company's pressmen and preparatory department employees. The Union was accepted by the slim margin of 8–6 and was certified on February 16. Bargaining did not begin until nearly a year later, however, because respondent initially refused to negotiate. The Board declared an unfair labor practice in August 1972, and bargaining finally commenced in January 1973. Negotiations continued for twenty-one months with moderate success, and it is conceded that throughout this period respondent bargained in good faith. During this period, employee turnover was so high that a list of employees given to the Union in March 1974 included only three or four of the original unit members. Moreover, by the fall of 1974, the number of employees in the unit had increased from fourteen to thirty-three.

In September 1974, after respondent had cancelled several negotiating sessions, the Union again charged an unlawful refusal to bargain. After a number of communications between Mr. Seide, the Union's business representative, and Mr. Husband, an attorney who had just been retained by the company, negotiations were resumed, and the charges were dropped. Respondent agreed to provide the Union with an updated list of the unit members' names and addresses and, on October 15, posted the following notice on the plant bulletin board:

> As I was required to do since last year, I have been negotiating with Local 51 as your local bargaining agent. They requested that I furnish them with your names and addresses.

> My attorney has advised me that the Union is entitled to this information and I will furnish this to the union agent when he returns from his vacation, next week.

On October 16, respondent added this notice to the board:

> Foster Brown

> Frederic Harber

> Richard Dill

> Henry Seaborough

> Will the above named employees please come into my office with their home addresses. Also will any other employees

---

1. New York Printing Pressmen & Offset Workers Union, Local 51, IPP & U.A. of N.A., AFL–CIO.

who have moved since coming to work or who have moved without notifying the office, please come in with your new addresses.

This second notice was posted in the late afternoon during the transition from the day shift to the night shift. Simmons, the most experienced pressman on the night shift, and approximately seven other employees read the notice, discussed the matter of giving their names and addresses to the Union, and reached a consensus not to provide that information. Simmons then drafted a petition which read:

> We the employees of Alvin J. Bart, Inc. do not wish to have our names and addresses given to Local 51. We the employees of Alvin J. Bart do not want to be represented by Local 51.

The petition was passed around and signed by those who had reached the consensus, after which Simmons circulated it among the other employees. Simmons then sought out the company's president, Mr. Bart, and handed him the petition, saying, "The guys don't want our names and addresses given to the Union. They don't want the Union." Mr. Bart simply accepted the petition and said that no action would be taken until he had consulted with his attorney. During the next few days, a number of employees told Mr. Bart they did not want the Union representing them.

Mr. Bart discussed the petition with Husband, who wrote to Seide on October 19, 1974, stating that in view of the petition the company would no longer bargain with the Union and would not supply the unit members' names and addresses. In December 1974, the company unilaterally granted a wage increase to members of the bargaining unit. On March 13, 1975, a majority of the unit members signed a second petition repudiating the Union. On April 4, 1975, the Union filed the instant unfair labor

practice charge, alleging violations of sections 8(a)(1) and (5) of the Act.

At the hearing before Administrative Law Judge Rosenberg, most of the testimony pertained to the question of Simmons' supervisory status. Simmons had been switched to the night shift in July 1974; and, although he spent most of his time at his two-color press, he was effectively in charge of the seven other night-shift pressmen whenever the pressroom foreman, Phil Canzoneri, left for the night. The Administrative Law Judge, relying almost exclusively upon two affidavits prepared for Simmons by a Board agent during pre-hearing interviews, found that Simmons was a supervisor under section 2(11) of the Act because he had authority to grant overtime, direct the work of other pressmen, and recommend pay increases. The Administrative Law Judge found, moreover, that when Simmons transferred to the night shift, he received a pay increase in excess of that ordinarily accompanying such a transfer and filled a position left vacant six months earlier by the departure of the night foreman, Rene Carrion.

Regarding the company's reasonable doubt of the Union's majority status, it was conceded that no company officer had encouraged or known of Simmons' activities prior to his presentation of the petition to Mr. Bart. And there was no evidence that Simmons coerced or in any way persuaded the employees to sign the petition. The Administrative Law Judge did not hold that section 8(a)(1) had been violated.[2] He concluded, however, that there had been a violation of section 8(a)(5) because, he said, the company knew Simmons was a statutory supervisor and learned upon Simmons' presentation of the petition that he had prepared and circulated it. The company was therefore "fully apprised that the petition and its contents did not necessarily reflect

---

**2.** Both the N.L.R.B. and respondent have assumed in their briefs that the Administrative Law Judge found a violation of section 8(a)(1). The Administrative Law Judge's order did indeed contain a clause prohibiting the company from interfering with, restraining, or coercing employees in the exercise of their section 7 rights—a clause that would ordinarily be based upon a finding of a section 8(a)(1) violation. However, the Administrative Law Judge made no mention of section 8(a)(1) in his conclusions of law or in his discussions of the company's substantive offenses.

the spontaneous and uncoerced desires of his unit employees regarding collective representation, but was fostered and nurtured by a management agent." Accordingly, the Administrative Law Judge concluded that the company's purported reasonable good faith doubt was not based on objective considerations and could not be credited.

The Board, in a decision handed down nearly two and one-half years after the Administrative Law Judge's order, affirmed his findings and conclusions except insofar as the finding of Simmons' supervisory status was based upon his receipt of an unusually high wage increase or his replacement of the former night foreman, Carrion. The remainder of the Board's decision was devoted to the question whether Simmons' two pre-hearing affidavits were correctly admitted into evidence. The Board approved the admission of those affidavits by a divided panel and adopted the Administrative Law Judge's recommended order.

Respondent contends on appeal that Simmons' affidavits should have been excluded and that there is a lack of substantial evidence to support the findings of either Simmons' supervisory status or the company's lack of a good faith reasonable doubt of the Union's majority status. Because we base our denial of this petition on the latter of these grounds, we do not decide whether Simmons' affidavits were correctly admitted into evidence. Moreover, we consider the issues surrounding Simmons' supervisory status only insofar as they bear upon the central issue of the company's good faith reasonable doubt of the Union's majority status.

■■ The legal concepts determinative of an action such as this are well-established. Once a union has been certified as a collective bargaining agent, its representative status is presumed irrebuttably to continue for one year. *NLRB v. Windham Community Memorial Hospital*, 577 F.2d 805, 810 (2d Cir. 1978). During this period, an employer's withdrawal of recognition constitutes an unfair labor practice. *Id.* at 811. Following the certification year, the presumption of the Union's majority status

becomes rebuttable by a showing either that the Union did not in fact enjoy majority support when recognition was withdrawn or that the refusal to bargain was based on a serious good faith doubt of the Union's majority. *Id.* To establish such a good faith doubt, "the employer must present clear and convincing evidence of loss of union support capable of raising a reasonable doubt of the Union's continuing majority." *Id.* (quoting *Retired Persons Pharmacy v. NLRB*, 519 F.2d 486, 489–90 (2d Cir. 1975)). This reasonable doubt cannot be proven merely by the employer's "unfounded speculation or . . . subjective state of mind." *NLRB v. Gulfmont Hotel Co.*, 362 F.2d 588, 589 (5th Cir. 1966). Rather, the test is an objective one, although subjective evidence may be used to bolster the employer's argument. *Windham, supra*, 577 F.2d at 811. Because reasonable doubt is a question of fact, the Board's determination must be affirmed if supported by substantial evidence in the record as a whole. *Id.*

■ In this case, that evidence is lacking. To begin with, the margin of victory at the 1972 election was only one vote, thereby rendering the presumption of union majority weak at best. *NLRB v. Gallaro*, 419 F.2d 97, 100 (2d Cir. 1969). The company was aware that by 1974 the unusually high rate of employee turnover had left only three or four of the original unit members. *See NLRB v. General Stencils, Inc.*, 472 F.2d 170, 175 n. 5 (2d Cir. 1972); *Royal Typewriter Co. v. NLRB*, 533 F.2d 1030, 1036 n. 7 (8th Cir. 1976). The company knew also that the size of the bargaining unit had more than doubled since 1971 and that because Seide had had no contact with the new employees he would be a virtual stranger to them. *See New York Printing Pressmen and Offset Workers Union, Local 51 v. NLRB*, 575 F.2d 1045, 1048–49 (2d Cir. 1978). In fact, before Husband was retained by the company, Seide confided to him that employee support at the company was lacking, a message that Husband then

relayed to Mr. Bart.[3] *See Universal Life Ins. Co.*, 169 NLRB 1118 (1968). When a different union sought to represent another unit of company employees, the members of the instant unit expressed anti-union sentiment to Mr. Bart. *See Zim's Foodliner, Inc. v. NLRB*, 495 F.2d 1131, 1140 (7th Cir.), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974). Lastly, three-fourths of the unit members signed the anti-union petition,[4] *see Gallaro, supra*, 419 F.2d at 100, and a few expressed their views directly to Mr. Bart. *See Zim's Foodliner, Inc., supra*, 495 F.2d at 1140.

The cumulative effect of the foregoing precludes any justifiable argument that respondent's refusal to bargain was not based upon a good faith reasonable doubt as to the Union's majority status. *See National Cash Register Co. v. NLRB*, 494 F.2d 189, 194–95 (8th Cir. 1974); *Ingress-Plastene, Inc. v. NLRB*, 430 F.2d 542, 546–47 (7th Cir. 1970). Indeed, the Board does not seriously contend that the Union actually had majority support, relying only upon the rebuttable presumption to that effect. *See id.* at 547. Respondent, on the other hand, has demonstrated its confidence in its position by its expressed willingness to accept an N.L.R.B.-conducted election to determine whether its employees want the Union to represent them.[5] Under the circumstances, unless respondent was guilty of an unfair labor practice that significantly contributed to the Union's loss of status or destroyed respon-

dent's claim of good faith, respondent should not be forced to the bargaining table. *See NLRB v. Anvil Products, Inc.*, 496 F.2d 94, 96- 98 (5th Cir. 1974); *National Cash Register Co., supra*, 494 F.2d at 195; *Daisy's Originals, Inc. v. NLRB*, 468 F.2d 493, 500- 03 (5th Cir. 1972); *NLRB v. Nu-Southern Dyeing & Finishing, Inc.*, 444 F.2d 11, 15 16 (4th Cir. 1971); *Fremont Newspapers, Inc. v. NLRB*, 436 F.2d 665, 672–73 (8th Cir. 1970).

█ The Board devotes almost its entire brief to its argument that Simmons was a supervisory employee and that his pre-hearing affidavits were admissible to establish this fact. It devotes but several lines to a discussion of Simmons' alleged wrongdoing. This disparity is not surprising in view of the Board's own findings on this issue. This is simply not a case in which threats or promises were made by anyone with the intent of causing employee disaffection from the union. *See Fort Smith Broadcasting Co. v. NLRB*, 341 F.2d 874, 879–80 (8th Cir. 1965); *Wellington Mill Division, West Point Manufacturing Co. v. NLRB*, 330 F.2d 579, 584 (4th Cir.), *cert. denied*, 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88 (1964); *NLRB v. Brookside Industries, Inc.*, 308 F.2d 224, 226 (4th Cir. 1962). The record shows that the employee petition was spontaneously conceived and was circulated in an atmosphere free of coercion. The Administrative Law Judge found that when the petition was circulated the employees

---

3. During the line of questioning that brought out this admission, objected to by Seide as "trickery", the Administrative Law Judge aptly remarked that Seide should have heeded the advice found on World War II posters: "Shhh! The enemy might hear you."

4. There was some dispute as to the size of the unit, but the anti-union majority was conceded to be either 24 of 33 members, or 22 of 31 members.

5. An employer who has unlawfully coerced his employees into an anti-union bias has, of course, nothing to lose by arguing for an election. However, this is not a case of unlawful coercion. Moreover, seven years have elapsed since the Union was narrowly elected by a small group of long-since departed employees. Over four years have elapsed since respondent's allegedly improper conduct took place,

and nearly three years since the Administrative Law Judge made his findings and recommendations. This delay was not caused by delaying tactics of the employer. *See NLRB v. Mercy College*, 536 F.2d 544, 550 (2d Cir. 1976); *cf. NLRB v. Patent Trader, Inc.*, 426 F.2d 791, 792 (2d Cir. 1970). If, as this Court has said, the interests the National Labor Relations Act is designed to protect are primarily those of the employees, *see NLRB v. Superior Fireproof Door & Sash Co.*, 289 F.2d 713, 724 (2d Cir. 1961), one may well wonder whether an open free election rather than a bargaining order would not be the preferred remedy. *See General Stencils, Inc., supra*, 472 F.2d at 175 n. 5; *NLRB v. American Cable Systems, Inc.*, 427 F.2d 446, 448 (5th Cir.), *cert. denied*, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970).

were told, "Read this, and if you like it, sign it, and if you don't like it, don't sign it." *See Henry I. Siegel Co. v. NLRB*, 328 F.2d 25, 26 (2d Cir. 1964). It was conceded, and the Board found, that no company official instigated, encouraged, or was aware of, the activities of Simmons or the other employees. *See NLRB v. General Industries Electronics Co.*, 401 F.2d 297, 300 (8th Cir. 1968). Any coerciveness that might be thought to flow from Simmons' supervisory status alone would have been quite minimal because his supervisory prerogatives were marginal at best.[6] *See Bourne v. NLRB*, 332 F.2d 47, 48 (2d Cir. 1974); *International Union v. NLRB*, 124 U.S.App.D.C. 215, 363 F.2d 702, 707 (D.C.Cir.), *cert. denied*, 385 U.S. 973, 87 S.Ct. 510, 17 L.Ed.2d 436 (1966). Such authority as Simmons had was limited to a small group of night employees; he had no authority whatever over the day pressmen or the workers in the preparatory department. *Cf. NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 858-59 (2d Cir. 1966); *NLRB v. Arma Corp.*, 122 F.2d 153, 156 (2d Cir. 1941).

■ In short, General Counsel has not sustained the burden of proof that this Court has declared to be his. *See Textile Workers Union v. NLRB*, 386 F.2d 790, 792 (2d Cir. 1967). There is no substantial evidence in the record to support the charge that respondent was guilty of an unfair labor practice.[7]

Enforcement is denied.

---

6. The Board based its finding of Simmons' supervisory status on his authority to grant overtime, recommend pay increases, and direct the work of other pressmen. However, Simmons spent the majority of his time at his own press, and his work allocations were usually made in accordance with Canzoneri's instructions. Whenever a serious question arose, Simmons was supposed to call Canzoneri at his home. The only pay increases Simmons recommended were for his "helper", a practice which apparently extends to other pressmen as well.

7. In view of respondent's good faith doubt of the Union's majority status and its justified refusal to bargain, the subsequently granted wage increase was not an unfair labor practice. *See Gallaro, supra*, 419 F.2d at 101–02; *NLRB v. Minute Maid Corp.*, 283 F.2d 705, 711 (5th Cir. 1960); *NLRB v. West Ohio Gas Co.*, 172 F.2d 685, 687 (6th Cir. 1949).